774 F.2d 417
 William M. YORK, dba York Arms Co., Plaintiff-Appellant,
v.
SECRETARY OF TREASURY; Stephen E. Higgins, Director Bureau
of Alcohol, Tobacco and Firearms (BATF) and John
Does 1 through 20, Agents of BATF,
Defendants- Appellees.
 No. 84-1370.
 United States Court of Appeals,
Tenth Circuit.
 Oct. 1, 1985.
 
 Loni F. DeLand and Herschel Bullen of McRae & DeLand, Salt Lake City, Utah, for plaintiff-appellant.
 Brent D. Ward, U.S. Atty., and Barbara W. Richman, Asst. U.S. Atty., Salt Lake City, Utah, for defendants-appellees.
 Before LOGAN, SETH and SEYMOUR, Circuit Judges.
 LOGAN, Circuit Judge.
 
 
 1
 After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. See Fed.R.App.P. 34(a); Tenth Cir.R. 10(e). The cause is therefore ordered submitted without oral argument.
 
 
 2
 Plaintiff William M. York appeals from the district court's grant of summary judgment for defendants, the Secretary of the Treasury and the Director and agents of Bureau of Alcohol, Tobacco and Firearms (BATF). York sued for injunctive and other relief from a BATF ruling classifying the YAC STEN MK II weapon as a "machinegun." York claimed that (1) the BATF ruling was arbitrary, capricious, and an abuse of discretion; (2) the BATF ruling violated his rights as seller of the gun to due process and equal protection; and (3) he is entitled to de novo review of the agency's decision.
 
 
 3
 In 1982 the BATF became aware that York was selling a gun called the YAC STEN MK II, a somewhat modified version of the famous World War II British STEN submachine gun. BATF issued its ruling after examining a sample obtained through normal commercial channels. York, a federally licensed firearms manufacturer, had ignored the BATF's request for a sample to enable classification of the gun under the National Firearms Act, 26 U.S.C. Secs. 5801-5872.
 
 
 4
 Before the ruling, York had written to the BATF to request general information on the standards applicable to his business but had made no mention of the STEN. In response, the BATF sent York several publications but recommended that he contact the Bureau with specific questions. York made no further written inquiries, although he was aware that the STEN's status was in question and apparently made some telephone inquiries.
 
 
 5
 After classifying the STEN as a "machinegun" under 26 U.S.C. Sec. 5845(b), BATF agents told York to recall the weapons already sold and advised purchasers by letter to return the guns. York resisted the recall and filed this action. The district court granted defendants' motion for summary judgment and dismissed York's complaint with prejudice.
 
 
 6
 * Congress has delegated the administration of the National Firearms Act to the Department of the Treasury, which acts through the BATF. See Davis v. Erdmann, 607 F.2d 917, 918 (10th Cir.1979) (judicial recognition of the administrative hierarchy). Under 26 U.S.C. Sec. 7805(a), the Secretary of the Treasury or his delegate "shall prescribe all needful rules and regulations for the enforcement" of the Internal Revenue Code title, which includes the National Firearms Act. In the present case, the BATF was using that enforcement power to interpret 26 U.S.C. Sec. 5845(b), which provides that a "machine gun" includes "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." Id.
 
 
 7
 The Bureau designated the STEN a machinegun in ATF Ruling 83-5. The ruling noted that the STEN had identical design characteristics to the original World War II submachinegun, except for a disconnector intended to prevent more than one shot from being fired with a single trigger function. The ruling stated:
 
 
 8
 "The trip lever (disconnector) is designed in such a way a simple modification to it, such as bending, breaking or cutting allows the weapon to operate automatically. Thus, this simple modification to the trip lever (disconnector), together with STEN submachinegun design features and components in the YAC STEN MK II carbine, permits the firearms to shoot automatically, more than one shot, without manual reloading by a single function of the trigger. The above combination of machinegun design features as employed in the YAC STEN MK II carbine are not normally found in the typical sporting firearm."
 
 
 9
 R. I, 137-38. After noting that the National Firearms Act defined a weapon that shoots automatically, or can be readily restored to shoot automatically, more than one shot by a single trigger function, as a machinegun, the Bureau ruling declared:
 
 
 10
 "The 'shoots automatically' definition covers weapons that will function automatically. The 'readily restorable' definition defines weapons which previously could shoot automatically but will not in their present condition. The 'designed' definition includes weapons which have not previously functioned as machineguns but possess specific machinegun design features which facilitate automatic fire by simple alteration or elimination of existing component parts."
 
 
 11
 R. I, 138.
 
 
 12
 The BATF ruling on the STEN was thus an administrative interpretation of an existing statute. Under Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1964), "when faced with a problem of statutory construction, [a court] shows great deference to the interpretation given the statute by the officers or agency charged with its administration." Id. at 16, 85 S.Ct. at 801. This court similarly has held that a court "should not overturn an administrative interpretation of a statute which it is charged with administering unless it can be said that the interpretation is plainly erroneous." Board of Directors and Officers, Forbes Federal Credit Union v. National Credit Union Administration, 477 F.2d 777, 784 (10th Cir.), cert. denied, 414 U.S. 924, 94 S.Ct. 233, 38 L.Ed.2d 158 (1973). Although an interpretative rule like the one involved in this case is not granted the "force of law" of legislative rules, it still requires deferential treatment by the court. Compensation Commission of Alaska v. Aragon, 329 U.S. 143, 153-54, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946).
 
 
 13
 Applying these standards to the facts of this case, we hold that the BATF classification was based on relevant factors, was not a clear error of judgment, and was not arbitrary, capricious, or an abuse of discretion. Although York argues that the BATF has not classified other firearms that are "readily convertible" to automatic weapons as machineguns, there are statements in the record outlining important distinctions between those guns and the STEN. Charles Lanum, a firearms enforcement officer with the BATF, explained to York in a November 1983 meeting that the YAC STEN MK II was merely a manipulation of the parts of the original British STEN, not a redesign. In contrast, several of the weapons that York characterized as comparable were not designed originally to accommodate machinegun parts. The BATF ruling stressed that the disconnector in the YAC STEN MK II, which must prevent automatic fire, could be disabled by mere bending, breaking, or cutting. In response to a letter from York's congressman, the BATF asserted that other weapons were neither designed originally to fire automatically nor able to be converted without substantial alteration or substitution of parts. York has never offered any evidence contradicting these points beyond his own vehement insistence that the unclassified guns are the same as the STEN. In fact, his counsel admitted when arguing against the summary judgment motion that there was no way to demonstrate that the YAC STEN MK II could not be converted to automatic operation.
 
 
 14
 York has also detailed the adverse impact the BATF ruling will have on his business. But harsh consequences for York's business alone are not enough to find an agency's action unreasonable. See Gulf Oil Corp. v. Hickel, 435 F.2d 440, 447-48 (D.C.Cir.1970).
 
 II
 
 15
 Analysis of whether the BATF followed necessary procedures requires us first to decide whether the Bureau's action qualifies as an adjudication or a rulemaking. We are convinced that it includes elements of both. See 2 K. Davis, Administrative Law Treatise Sec. 10:5 (2d ed. 1979) (recognizing that most agency actions involve elements of both adjudication and rulemaking).
 
 
 16
 The portion of the BATF ruling that further defines the language of 26 U.S.C. Sec. 5845(b) was merely an interpretative rule not subject to either notice and comment procedure under 5 U.S.C. Sec. 553 or the formalities of an agency hearing under 5 U.S.C. Secs. 556-557.[1] See, e.g., American Postal Workers Union, AFL-CIO v. U.S. Postal Service, 707 F.2d 548, 559 (D.C.Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984). In contrast, that portion of the Bureau's ruling placing the STEN in the category of machineguns, i.e., applying the law to the facts of a particular case, was not a rulemaking of any stripe.[2] Rather, such agency action fell into the category of adjudication, albeit informal. Such decisions require adjudicatory hearings under the Administrative Procedure Act only when a statute demands that they be made "on the record after opportunity for an agency hearing." 5 U.S.C. Sec. 554(a); see also Anaconda Company v. Ruckelshaus, 482 F.2d 1301, 1306 (10th Cir.1973). There is no such requirement in this case. Further, the classification of the STEN falls under an exception to the hearing requirement for "proceedings in which decisions rest solely on inspections, tests, or elections." 5 U.S.C. Sec. 554(a)(3).
 
 
 17
 Nevertheless, York argues that the agency failed to observe his constitutional right to due process in this case. In this respect York evidently claims that he is constitutionally entitled to a predeprivation hearing. He complains that he was allowed "no input regarding the decision to construe the STEN a machinegun." Brief of Appellant at 12. He speaks of the deficiency in the administrative record and the Bureau's "redefinition" of the term "machinegun." Id. at 14-15.
 
 
 18
 York did receive notice of the Bureau's concern with the STEN several months before it classified the STEN as a machinegun. He chose to continue with his marketing plan without providing a sample of the gun to the BATF. He selected this course, despite his admission that the government has a "public interest" in regulating automatic weapons, because he did not want his business delayed by Bureau consideration. Nevertheless, there is no doubt that, as applied to prohibit further sales of the STEN and to require past purchasers to return the guns to York for refunds, the agency action here was summary. It was based chiefly upon the BATF's inspection of the STEN it acquired.
 
 
 19
 The Supreme Court has issued several recent decisions concerning when the Due Process Clause requires predeprivation hearings. In Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Court identified three factors that must be weighed in deciding what process is due:
 
 
 20
 "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail."
 
 
 21
 Id. at 335, 96 S.Ct. at 903. We can apply this test to the instant case.
 
 
 22
 York has an important interest affected by the BATF decision, which banned further sales of his gun and required him to recall and give refunds for guns already sold. But the two other considerations weigh heavily in favor of the government. The risk of error is low in this case because the evidence upon which the government relied to classify the STEN as a machinegun is scientific, engineering data--sharply focused, easily documented and not based to a significant extent upon witness credibility or other subjective determinations. See id. at 343-44, 96 S.Ct. at 906-07. And the government has a strong interest in regulating automatic weapons capable of criminal use, and in being able to act quickly to stem the flow of such weapons to the public. The Supreme Court has upheld, against similar due process claims, summary seizure of a mislabeled vitamin product. See Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950); see also North American Cold Storage Co. v. Chicago, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908) (destruction of food unfit for human consumption without a predeprivation hearing). We therefore hold that York was not deprived of his constitutional due process right by the government's action.
 
 
 23
 We believe, however, that constitutional due process does require a hearing for York after the issuance of the order classifying the STEN as a machinegun, if he contends the agency made a mistake of fact, i.e., that his gun does not meet the criteria set out in the BATF's expanded definition of "machinegun." See White v. Acree, 594 F.2d 1385 (10th Cir.1979). We do not read his briefs on appeal to make such a contention. As noted, York's counsel admitted there was no way to demonstrate that the STEN could not be converted to automatic operation.III
 
 
 24
 York's equal protection claim appears to be that he has been denied his rights because of selective enforcement. He contends that firearms similar to the STEN have not been classified as machineguns.
 
 
 25
 As the district court pointed out, "the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation." Oyler v. Boles, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1961). We have held in the parole revocation setting that one who succeeds on a selective enforcement claim must show by a preponderance of the evidence that (1) he or she has been singled out while others who are similarly situated have not been subjected to enforcement and (2) the selection has been invidious or in bad faith and based on intentional, purposeful discrimination stemming from impermissible considerations such as race, religion, or the desire to prevent the exercise of other constitutionally secured rights. Barton v. Malley, 626 F.2d 151, 155 (10th Cir.1980); see also United States v. Salazar, 720 F.2d 1482, 1487 (10th Cir.1983), cert. denied, --- U.S. ----, 105 S.Ct. 789, 83 L.Ed.2d 783 (1985). In addition, "[a]ggressively displaying one's antipathy to the ... system or daring the Government to enforce it does not create immunity from or a defense to, prosecution." United States v. Stout, 601 F.2d 325, 328 (7th Cir.), cert. denied, 444 U.S. 979, 100 S.Ct. 481, 62 L.Ed.2d 406 (1979); see also United States v. Rickman, 638 F.2d 182, 183 (10th Cir.1980).[3]
 
 
 26
 In this case, York has not met his burden to show selective enforcement. He has produced no evidence that there are other gun manufacturers who truly are "similarly situated." He also offers little beyond mere accusations that there was bad faith in the Bureau's actions. References in a license investigation report to his "reputation" for skirting regulations and to a "reasonable assumption" that the STENs could end up in criminal hands do not necessarily raise an inference of bad faith. Those industry rumors instead provided legitimate reasons for lawful investigation of the situation, i.e., inspection of the STEN. Once that was accomplished, the properties of the gun, and not the alleged proclivities of its maker, were the basis of the BATF ruling. As we have noted, York's "semi-automatic" guns were not the first to be classified as machineguns. Prior rulings took the same action on essentially the same basis for weapons from different sources.
 
 
 27
 AFFIRMED.
 
 
 
 [1]
 The Bureau's interpretation of the statute's wording in ATF Ruling 83-5 is consistent with its prior interpretations in two other cases. See ATF Rulings 82-2 and 83-5, R. I, 83-84
 
 
 [2]
 This case can be distinguished from Hoffman-La Roche, Inc. v. Kleindienst, 478 F.2d 1 (3rd Cir.1973), in which the court found agency action classifying certain drugs to be only a rulemaking. In Hoffman, the proposed agency order applied "across the board to all producers, wholesalers, and distributors ... as well as to pharmacies and physicians." Id. at 13. Hoffman was not in any special or unique circumstances, and the classification had only prospective application. Id. None of these factors are present in the STEN classification
 
 
 [3]
 York advertised kits for his STEN guns in a York Arms Company catalog as good weapons for those purchasers who "just don't care for Big Brother's record keeping program." R. I, 153. The STEN "Sputter Gun" also was advertised as the weapon for those "who want the fun and excitement of owning and firing a fully automatic weapon without the government tax and red tape." R. I, 155. The gun, according to the catalog, could be fired by simply holding it against the operator's bicep, inserting a loaded magazine, and pulling and then releasing the bolt handle. The main beauty of the gun, according to the catalog, was the absence of a trigger. Without a trigger, the advertisement reasoned, the gun could not be a machinegun under the statute