**MIAMI TRIBE OF OKLAHOMA,**
Plaintiff,

v.

**UNITED STATES of America,**
**et al., Defendants.**

No. 95–2205–JWL.

United States District Court,
D. Kansas.

April 10, 1996.

Kip A. Kubin, Payne & Jones, Chtd., Overland Park, KS, for Miami Tribe of Oklahoma.

Janice M. Karlin, Office of United States Attorney, Kansas City, KS, Glen R. Goodsell, U.S. Department of Justice, General Litigation Section, Environment and Natural Resources Div., Washington, DC, for U.S., DOI, and Bruce Babbit.

Glen R. Goodsell, U.S. Department of Justice, General Litigation Section, Environment and ·Natural Resources Div., Washington, DC, for DOI, Chairman of the National Indian Gaming Commission, Harold Monteau, and National Indian Gaming Commission.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

On January 30, 1995, the National Indian Gaming Commission (NIGC) disapproved a class II gaming management contract between plaintiff Miami Tribe of Oklahoma and Butler National Service Corporation. The disapproval was affirmed on April 4, 1995 and supplemented on June 9, 1995. In support of its disapproval, the NIGC cited an opinion obtained from the Department of the Interior that the land encompassed by the management contract is not "Indian land" as defined by 25 U.S.C. § 2703(4). Plaintiff then petitioned this court for review of the agency's decision and now seeks a ruling that the land in question does constitute Indian land. For the reasons set forth below, the court concludes that the land in question is not Indian land. As a result, the NIGC's action is affirmed.

## I. *Procedural Background*

This case arises from plaintiff's proposal, in the form of the management contract, to build a bingo facility on land known as the Maria Christiana Miami Reserve No. 35 (Reserve No. 35).[1] Under 25 U.S.C. § 2711, an Indian tribe may, subject to the approval of the chairman of the·NIGC, enter into such a contract.

As part of its review, the NIGC requested an opinion from the Department of Interior regarding whether or not Reserve No. 35 qualified as "Indian land" within the meaning of the Indian Gaming Regulatory Act (IGRA). Noting the request but prior to receiving the opinion, the NIGC disapproved the management contract, citing four bases. First, the management contract was not authorized by the Miami Tribe Gaming Act (MTGA), the tribal ordinance governing gambling. Second, no determination regarding the environmental impact of the proposed development had been made. Third, the background investigations required by 25 C.F.R. § 537 were not complete. Fourth, plaintiff had either not submitted some necessary documents or had submitted incomplete documents.

Plaintiff appealed the ruling but the NIGC affirmed on April 4, 1995. In its affirmation, however, the NIGC noted that the first basis for disapproval was no longer applicable due to an amendment to the MTGA. On June 9, 1995, the NIGC supplemented its ruling with the opinion of the Department of Interior that Reserve No. 35 was not Indian lands as defined by IGRA.

## II. *Discussion*

The IGRA defines "Indian lands" to mean: (A) all lands within the limits of any Indian reservation; and (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.

25 U.S.C. § 2703(4). Both parties agree that Reserve No. 35 is not within the limits of any Indian reservation. Both parties agree that Reserve No. 35 is a restricted Indian allotment that satisfies the first component of section 2703(4)(B). As a result, the parties' dispute centers on whether or not plaintiff exercises governmental power over Reserve No. 35. The NIGC ruled that it does not. Plaintiff challenges that conclusion and the procedure used to reach it.

### A. *Procedural Concerns*

■ Before turning to plaintiff's substantive arguments, the court addresses plaintiff's procedural concerns. Because plaintiff's papers present arguments in an uninterrupted flow, however, it is not clear exactly what procedures plaintiff challenges. Plaintiff apparently objects to the NIGC's reliance on the legal analysis of the Department of the Interior rather than following the procedures outlined in 5 U.S.C. § 554. The court finds 5 U.S.C. § 554 inapplicable, however.

Section 554 applies only when the statute requires the adjudication "to be determined on the record after opportunity for an agency hearing." *Id.* § 554(a); *accord York v. Secretary of Treasury,* 774 F.2d 417, 420 (10th Cir.1985). Plaintiff has pointed to no section of the IGRA or its accompanying regulations requiring a hearing on the record before the NIGC determines whether or not to approve a management contract. Nor has the court found any such requirement. Section 2706(b)(8) permits, but does not require, the NIGC to hold hearings "as it deems appropriate." In sharp contrast, the IGRA does impose a hearing requirement on certain other decisions. *See, e.g.,* 25 U.S.C. § 2710(c)(2) (suspension of a gaming license); *id.* § 2710(c)(4) (issuance of certificate of self-regulation); *id.* § 2710(c)(6) (removal of certificate of self-regulation); *id.* § 2711(f)[2] (modification or voidance of a management contract) *id.* § 2713(b)(2) (determination of whether an order of temporary closure

---

**1.** Although originally totaling 200 acres, Reserve No. 35 presently totals approximately 35 acres.

**2.** This section comes closest to requiring a hearing before approving or declining to approve a management contract. Title 25 C.F.R. § 535.3, however, which cites 25 U.S.C. § 2711 for authority, suggests that section 2711(f) refers to the NIGC's power to void or require modifications to

should be dissolved or made permanent). Under this statutory framework, the court concludes that the NIGC was not obligated to comply with 5 U.S.C. § 554 when determining whether or not to approve the management contract.

Moreover, plaintiff admits that nothing in the IGRA or its regulations prohibit the NIGC from requesting a legal opinion from the Department of Interior. In its reply brief, however, plaintiff passingly states that such procedure violated its due process. The court disagrees. Plaintiff fully participated in the decision making process. Record document 61, for example, notes the NIGC's request for plaintiff's position on the Indian lands issue and contains the tribe's submission. In that document, plaintiff voices its opinion that it has submitted "all ... documents needed for completion of review." Plaintiff thus considered its position fully briefed. Record document 60 indicates that a copy of plaintiff's submission was attached to the NIGC's request for an opinion from the Department of Interior. Record document 74 also illustrates plaintiff's participation in the process. That neither the Department of Interior nor the NIGC agreed with plaintiff does not compel the conclusion that plaintiff did not receive due process. On the contrary, the record indicates that plaintiff's participation was solicited, received and considered. As noted above, the IGRA does not entitle plaintiff to a hearing on this question. Under these circumstances, the court finds plaintiff received the process it was due.

### B. Standard of Review

■ The NIGC's determination constitutes a final agency decision that is reviewable by this court. 25 U.S.C. § 2714. The NIGC, citing the opinion provided by the Department of Interior, concluded that plaintiff does not exercise governmental power over Reserve No. 35 because that land is not within the jurisdiction of the Miami tribe. After careful consideration, the court concludes that this decision is subject to two types of review.

Implicit in the NIGC's decision is the agency's determination that only those lands within an Indian tribe's jurisdiction can qualify as "Indian lands." That is, a necessary prelude to the exercise of governmental power is the existence of jurisdiction. This interpretation of the IGRA by the agency that administers the statute is reviewed according to the standards set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

The conclusion that plaintiff does not have jurisdiction, however, does not depend on an interpretation of a statute committed to the NIGC. Rather, the conclusion derives from the NIGC's evaluation of various treaties, United States Attorney General Opinions, House of Representative and Senate Committee Reports and court decisions, most dating from a century before the existence of the NIGC. As both parties agree, whether or not those combined authorities confer jurisdiction on plaintiff over Reserve No. 35 is a question of law. Legal determinations of this type are subject to de novo review. *See Koch v. United States*, 47 F.3d 1015, 1017 (10th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 303, 133 L.Ed.2d 208 (1995); *Howard v. Federal Aviation Admin.*, 17 F.3d 1213, 1215 (9th Cir.1994).[3]

---

a previously approved management contract. Moreover, even if section 2711(f) applied to management contracts awaiting approval, plaintiff does not challenge any of the NIGC's requests for modification; plaintiff challenges only the NIGC's decision not to approve the management contract.

3. The parties focus their standard of review arguments on 5 U.S.C. § 706. Plaintiff argues for application of the standards in 5 U.S.C. §§ 706(2)(E) and (F). Neither subsection, however, applies to an informal agency action. *CF & I Steel Corp. v. Economic Development Administration*, 624 F.2d 136, 139 (10th Cir.1980) (citing

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). As a result, plaintiff's reliance on subsections (E) and (F) is misplaced.

Defendant, citing subsection (A), asserts that the court should employ an arbitrary or capricious standard of review. In addition to requiring a reviewing court to set aside an agency action found to be arbitrary or capricious, however, subsection (A) also directs a similar result for conclusions found "not in accordance with law." The question becomes how closely should a court scrutinize an agency's decision in order to determine if it is in accordance with law.

## C. Requiring Jurisdiction to Exercise Governmental Power

■ The IGRA created the NIGC to, among other things, review management contracts for class II gaming. *See* 25 U.S.C. §§ 2704 and 2711. Part of that responsibility includes determining whether or not a tribe exercises governmental power over the land on which it seeks to conduct gaming. As noted above, when reviewing plaintiff's management contract, the NIGC implicitly decided that in order to exercise governmental power for purposes of 25 U.S.C. § 2703(4), a tribe must first have jurisdiction over the land. In *Chevron,* the Supreme Court established a two step review for such decisions:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question of whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2782. "The standard of review is the same whether the agency interpretation is performed through rulemaking or, as here, informal adjudication." *Arco Oil and Gas Co.*

Here, the agency's evaluation of whether or not plaintiff had jurisdiction does not draw upon any special expertise of the agency or involve an interpretation of the IGRA. Instead, the evaluation turns on the legal effect of various authorities, a question which is the everyday fodder of the courts. Accordingly, a deferential standard of review is not warranted. *Cf. Morris v. Commodity Futures Trading Comm'n,* 980 F.2d 1289, 1293 (9th Cir.1992) (directing the application of a de novo standard of review to an agency's application of law to a given set of facts where the issue in question falls within the court's expertise); *Maloley v. R.J. O'Brien & Assocs., Inc.,*

*v. EPA,* 14 F.3d 1431, 1433 (10th Cir.1993) (citation omitted).

Plaintiff correctly notes that Congress has not spoken to the precise question at issue: what does "exercises governmental power" mean? The phrase is susceptible to multiple interpretations. Aside from the words themselves, the statute does not elaborate on the phrase's intended meaning or scope. "[I]n the absence of more specific linguistic evidence of Congress's intention than the mere use of the [phrase "exercises governmental power"], [this court] cannot say on the basis of the statute's plain language that Congress has spoken directly to the question at issue." *Id.* at 1434 (citation omitted). Nor does anything in the legislative history appear to define the phrase. As a result, there is no "unambiguously express intent of Congress" for this court to apply.

Thus, the question becomes whether or not the NIGC's interpretation is based on a permissible construction of the statute. The court finds that it is. Absent jurisdiction, the exercise of governmental power is, at best, ineffective, and at worst, invasion. Therefore, the NIGC's interpretation is a permissible construction of the statute and will not be disturbed. Moreover, plaintiff does not appear to dispute that jurisdiction is a threshold requirement to exercising governmental power. Rather, plaintiff's substantive arguments each allege the existence of jurisdiction.

## D. The Jurisdiction of the Miami Tribe

Plaintiff does not contend that the NIGC relied on improper authority or overlooked a relevant statute. Rather, plaintiff asserts that the Department of Interior's opinion

819 F.2d 1435, 1440–41 (8th Cir.1987) (same); *Hi–Craft Clothing Co. v. NLRB,* 660 F.2d 910, 915 (3d Cir.1981) (same).

As shown below, the court agrees with the legal conclusion arrived at by the NIGC. In so agreeing, the court read plaintiff's supplemental submissions but found that they did not alter the conclusion compelled by the evidence in the record before the NIGC. The court's decision thus rests exclusively on the evidence contained in that record. As a result, the use of a de novo rather than an arbitrary or capricious standard of review actually has no impact on the outcome of this case.

mischaracterizes and draws unwarranted conclusions from the relevant authority. The court disagrees and finds that the Miami tribe does not have jurisdiction over Reserve No. 35.

### 1. *History of Reserve No. 35*

By article 10 of the treaty of November 6, 1838, 7 Stat. 569, the United States agreed to set aside for the Miami tribe, then located in Indiana, land west of the Mississippi river. The land was promised on the implied condition that the tribe would emigrate to the land. 17 Op. Att'y Gen. 410, 411 (1882). No guaranty or promise was made to those who did not emigrate. *Id.* In 1840, the tribe ceded all of its remaining land in Indiana and agreed to move to the land assigned to it within five years. Treaty of November 28, 1840, 7 Stat. 582. The Senate, when ratifying the treaty, set aside a tract of land for the tribe in present day Kansas.

In 1846, the Miami tribe emigrated and took possession of land set aside for it in Kansas. 17 Op. Att'y Gen. at 411. A large number of Miami Indians, however, remained in Indiana. By doing so, those Indians "severed their tribal relationship" with the Miami tribe. *Miami Tribe v. United States,* 150 Ct.Cl. 725, 281 F.2d 202, 213 (1960), *cert. denied,* 366 U.S. 924, 81 S.Ct. 1350, 6 L.Ed.2d 383 (1961), *overruled on other grounds,* 301 F.2d 667 (Ct.Cl.1962). Those who emigrated to Kansas (Western Miamis) were considered the Miami tribe; those remaining in Indiana (Indiana Miamis) were not regarded as members of the tribe. H.R.Ex.Doc. No. 23, 49th Cong., 1st Sess. at 26 (1886); 17 Op. Att'y Gen. at 411–12; 12 Op. Att'y Gen. 236, 239 (1867).

By the Treaty of June 5, 1854, 10 Stat. 1093, the Western Miamis agreed to cede all but 70,640 acres of their land to the United States. For its part, the United States agreed to make payments and investments to and on behalf of the Miami tribe totalling $200,000. The treaty also recognized the existence of the two groups of Miami Indians. Article 3 of the treaty prohibited the Indians remaining in Indiana from sharing in the compensation paid for the ceded, Kansas lands. Article 4 divided the remaining payments owed to the Miamis from the November 28, 1840 treaty between the Indiana Miamis and the Western Miamis and provided that no payments designated for the Indiana Miamis would be made to any person not included on a corrected list agreed on by the Indiana Miamis. The list included 302 names. Finally, the treaty stated that additional persons could be added to the list "by the consent of the said Miami Indians of Indiana, obtained in council, according to the custom of Miami tribe of Indians."

In 1858, several persons, including Maria Christiana DeRome (an infant), petitioned Congress to be included on the corrected list of Indiana Miamis. Members of the DeRome family had been excluded from the 1854 corrected list by the Commissioner of Indian Affairs, after consultation with the Miami chiefs or headmen, because they were not considered of the Miami blood. H.R.Exec.Doc. No. 23, 49th Cong., 1st Sess. 1, 6 (1886).

In response to this petition, Congress unilaterally directed the Secretary of the Interior to add 68 individuals (increased later to 73) to the corrected list. Act of June 12, 1858, 11 Stat. 329. The Secretary was also directed to pay to each individual an amount equal to the unpaid annuity payments from prior years and to allot to each individual 200 acres from the 70,640 reserved for the Miami tribe in Kansas. Maria Christiana DeRome was one of the individuals added to the annuity rolls and allotted 200 acres. Over time, that tract of land has been reduced to the 35 acres presently at issue. By 1867, however, those added to the corrected list in 1858 had been removed.[4]

---

4. Ostensibly, it appears that the individuals added pursuant to the 1858 legislation were deleted from the corrected list in 1867 as a result of an opinion issued by the Attorney General. 12 Op. Att'y Gen. 236 (1867). Plaintiff contends that the Attorney General merely determined who was on the corrected list as it stood in 1854. The language of the opinion lends some support to this position. Nevertheless, citing this opinion, numerous authorities have concluded that the individuals added to the corrected list in 1858 were removed in 1867. *See, e.g.,* Misc. Doc. No. 131, 53d Cong., 3d Sess. (1895) (setting forth the Court of Claims decision in *Indiana Miami Indians v. United States,* Congressional Case 9255); H.R.Report No. 3852, 51st Cong., 2d Sess. (1891) (setting forth the Court of Claims decision in *Western Miami Indians v. United States*). Moreover, although plaintiff disputes the propriety of the removal, it concedes that it did occur.

By the treaty of February 23, 1867, the Miami tribe was encouraged to move to Oklahoma. As a result, Congress enacted legislation by which the United States agreed to buy the Western Miami's unallotted lands in Kansas if the tribe signified its desire to sell, which it did on April 24, 1873. Act of March 3, 1873, 17 Stat. 631. In addition, section 4 of the statute directed the Secretary of the Interior to:

> cause to be taken a census of all the Miami Indians entitled to share in the reserved lands and the moneys set apart by the treaty between the United States and the Miami Indians dated [June 5, 1854], for that part of the tribe known as Western Miamis, including in said census those persons of Miami blood or descent for whom provision was made by the third section of the act of [June 12, 1858], if in the opinion of the Secretary of the Interior the said Indians are entitled to be so included under treaty stipulations; but in such census none shall be included unless justly entitled according to the provisions of said treaty.

The statute then directed the Secretary to compile two lists from the census data: first, those who chose to remain in Kansas, become United States citizens and cease membership in the Miami tribe; and second, those who chose to move to Oklahoma and remain "under the care of the United States" as a member of a tribe. Thus, all Western Miamis were placed on one of the two lists.

When compiling the census of the Western Miamis, the Secretary of the Interior determined that none of those individuals added by the act of June 12, 1858 should be included. H.R.Ex.Doc. No. 23, 49th Cong., 1st Sess. at 25–27 (1886). The Secretary reasoned as follows:

> It seems to me manifest that a clear distinction is made by [the 1854 treaty] between the Miami tribe and certain Indians who had failed to accompany the tribe west of the Missouri, and continued to reside elsewhere, and that none are included as members of the tribe except those who had accompanied the chiefs of the tribe west of the Missouri, and that the benefits to be derived from the reservation of 70,000 acres for their future homes, and the annuity or annuities guaranteed by the

third article of the treaty, were secured to the members of the tribe of Miamis, as herein defined and explained.

> The sixty-eight persons, therefore, who were, under the Act of June 12, 1858, added to the list of Miami Indians of Indiana are not entitled to any share in the proceeds of the lands that are to be sold under the first section of the act of March 3, 1873; nor are they entitled to any of the annuities which, by the treaty of 1854, are guaranteed to the Miami Tribe of Indians.

*Id.* at 26.

In 1882, Congress passed "an act to provide for the sale of the lands of the Miami Indians in Kansas." Act of May 15, 1882, 22 Stat. 63. In that act, Congress directed the Secretary of the Interior to obtain the opinion of the Attorney General regarding what rights the Indiana Miamis had in the Kansas land and if they were entitled by the 1854 treaty to have parcels allotted to them. In due course, the Attorney General issued his opinion, stating that only those Miamis who emigrated west to Kansas and resided on the land reserved for the Western Miami tribe by the Treaty of 1854 were entitled to allotments or their proceeds; the Indiana Miamis were not. 17 Op. Att'y Gen. 410, 412 (1882). In so concluding, the Attorney General relied on the language of the 1854 treaty which granted allotments only to individuals "now residing on said lands," *i.e.,* land in Kansas. After reaching his opinion, the Attorney General discussed the 1858 legislation, by which Maria Christiana DeRome received an allotment. The Attorney General, citing the opinions given by a previous Attorney General and the Secretary of the Interior pursuant to the Acts of March 2, 1867 and March 3, 1873 respectively, concluded that the 1858 legislation had been "virtually repealed." 17 Op. Att'y Gen. at 415.

In 1884, the Western Miamis, with the help of counsel, petitioned Congress, asking that the Western Miamis be reimbursed for the money and lands taken from them and improperly given to the 73 individuals by the Act of June 12, 1858. H.R.Report No. 3852, 51st Cong., 2d Sess. at 2 (1891). Congress referred the petition and accompanying documents to the Court of Claims. *Id.* The

Court of Claims found that a total of $18,-370.89 had been paid to 73 persons out of funds set aside for the Western Miamis without their consent and that 14,533.38 acres of land valued at $43,600.14 were allotted to the same individuals "without consultation with the tribe and without the consent of the chiefs." *Id.* As a result of the Court of Claims's decision, the United States in 1891 paid the Western Miami tribe $61,971.03 ($18,370.89 + $43,600.14) to compensate it for annuities improperly paid and for land improperly allotted to the 73 individuals as a result of the 1858 legislation. *Miami Tribe,* 281 F.2d at 212 (citing 26 Stat. 1000).

As a coda, the Western Miami in 1960 sought interest on the payments made in 1891. The Court of Claims concluded that the 1858 legislation had unlawfully taken funds and land designated for the tribe. *Id.* The Court therefore awarded interest from the time of the payments and allotments, 1858 and 1859 respectively, until 1891. *Id.* The interest totaled $100,072.19.

### 2. *Jurisdiction Due to the History of Reserve No. 35*

■ Plaintiff alleges that its jurisdiction over Reserve No. 35 stems from the initial award of the reservation in Kansas. Plaintiff is correct that tribes possess "attributes of sovereignty over both their members and their territory." *United States v. Wheeler,* 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978). "[S]overeign power, even when unexercised, is an enduring power . . . and will remain intact unless surrendered in unmistakable terms." *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 148, 102 S.Ct. 894, 907, 71 L.Ed.2d 21 (1982). Congressional intent to terminate a reservation must "be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history." *Mattz v. Arnett,* 412 U.S. 481, 505, 93 S.Ct. 2245, 2258, 37 L.Ed.2d 92 (1973). Although agreeing with plaintiff on the applicability of these principles, the court disagrees with the conclusion plaintiff draws from them.

■ Because Reserve No. 35 is located inside the original boundaries of the reservation, plaintiff initially had jurisdiction over the land. *See United States v. Celestine,* 215 U.S. 278, 285, 30 S.Ct. 93, 94–95, 54 L.Ed. 195 (1909). In 1873, however, plaintiff agreed to sell its unallotted lands in Kansas. In 1882, Congress bought the lands. Apparently unsatisfied, the Miami tribe sought reimbursement in 1884 for the land allotted to, among others, Maria Christiana DeRome. Thus, plaintiff in 1884, in essence, claimed that the Maria Christiana allotment should be treated as unallotted land and sold to the United States. The Court of Claims agreed and plaintiff was compensated. Not quite a century later plaintiff advanced the same position when it sought interest. Again the Court of Claims agreed. This court has no difficulty concluding from this series of events that plaintiff unmistakably relinquished its jurisdiction over Reserve No. 35.[5]

Moreover, the 1867 treaty and the 1873 legislation clearly contemplated the move of the Miami tribe to Oklahoma. Those Miamis wishing to remain in Kansas, sever their ties with the tribe and become United States citizens were permitted to do so but Congress unambiguously intended to abrogate the tribe's authority over its lands in Kansas and move the tribe to new lands in Oklahoma. Plaintiff contends, however, that there is no evidence that Congress's abrogation of the tribe's authority over Reserve No. 35 was effective. Plaintiff states that the record contains no evidence that the heirs of Maria Christiana DeRome became United States citizens. This argument is unpersuasive.

The unspoken premise of plaintiff's argument is that Maria Christiana DeRome and her heirs were members of the Miami tribe. As noted below, however, if such membership existed, it ended no later than 1867. By its terms, the 1873 legislation applies only to members of the tribe.

Furthermore, even if the heirs of Maria Christiana DeRome were members of the

---

5. Plaintiff points to the continued restricted status of Reserve No. 35 as proof of its jurisdiction. Reserve No. 35's restricted status, however, does not arise from any lingering traces of plaintiff's sovereignty but rather from the terms of the United States's conveyance of the property to

Maria Christiana DeRome. As both the tribe and the government have acknowledged, the patent issued covering the allotment contained a clause stating that the land could not be conveyed or sold without the consent of the Secretary of the Interior. *See* Record Documents 74 and 75.

Miami tribe at one time, authority exists compelling the conclusion that those heirs remained in Kansas and severed their ties to the tribe. According to H.R.Report 22, 47th Cong., 1st Sess. (1882), 33 Miami Indians remained in Kansas and became citizens pursuant to the 1867 treaty and the 1873 legislation. The report does not mention who those Indians were. Nor does the report indicate whether or not other Miamis stayed in Kansas but failed to become citizens. If such Miamis existed, however, they or their heirs became naturalized citizens no later than 1924. Act of June 2, 1924, 43 Stat. 253 (naturalizing "Indians born within the territorial limits of the United States"). As a result, no later than 1924, any heir of Maria Christiana DeRome who remained in Kansas became a citizen. Similarly, no later than 1924, Congress's abrogation of the Miami tribe's jurisdiction over Reserve No. 35 was effective.

Thus, plaintiff's arguments for jurisdiction arising for the history of Reserve No. 35 must be rejected for two reasons. First, plaintiff unmistakably relinquished its jurisdiction no later than 1884. Second, it is clear from the circumstances surrounding the 1873 legislation that Congress expressly abrogated the tribe's jurisdiction. The abrogation was effective no later than 1924. Plaintiff therefore does not have jurisdiction over Reserve No. 35 by virtue of the original inclusion of the tract within the Kansas reservation.

### 3. *Jurisdiction Due to Membership in the Tribe*

Plaintiff also contends that it has jurisdiction over Reserve No. 35 due to the membership of Maria Christiana DeRome and/or her descendants in the Miami tribe. Even if a tribe's jurisdiction reaches its members' real property located outside the reservation, a question the court need not address, plaintiff's argument must be rejected. The record simply does not establish the membership of the past or present owners of Reserve No. 35 in the Miami tribe.

Plaintiff's contention that Maria Christiana DeRome was a member of the tribe rests solely on the fact that Congress made an allotment. Even if the government considered Maria Christiana DeRome a member of the tribe in 1858, those added to the corrected list in 1858 were removed in 1867. Thus, by 1867 at the latest, the government did not consider either Maria Christiana DeRome or her heirs to be members of the Miami tribe.[6] Similarly, until recently, plaintiff has persuasively contended that Maria Christiana DeRome was not a member of the tribe. The Court of Claims twice accepted this argument, holding that the allotment to Maria was improper and violated the treaty of 1854 because that treaty set aside land for the Miami tribe, the members of which the court found to be those who, unlike the DeRome family, emigrated west. H.R.Report No. 3852, 51st Cong., 2d Sess. at 2 (1891). Thus, even if Maria Christiana DeRome was a member of the tribe by fiat of Congress, that membership (as well as the membership of her heirs) ended in 1867. Any jurisdiction stemming from Maria Christiana DeRome's abbreviated membership ended in either 1884, when it was unmistakably relinquished or in 1924, when Congress's abrogation became indisputably effective. With that ended any argument that the tribe has jurisdiction over Reserve No. 35 by virtue of Maria Christiana DeRome's membership in the tribe.

Plaintiff also maintains, however, that the current owners of Reserve No. 35 are members of the Miami tribe. Plaintiff points to numerous ordinances passed by the tribe and to a newly adopted amendment to the tribal constitution.[7] The court need not pass on the validity of these measures because the record is devoid of evidence, as opposed to unsupported assertions, that the present owners of Reserve No. 35 have consented to become members.[8] Such consent is neces-

---

**6.** Plaintiff does not allege that any of Maria Christiana DeRome's heirs are tied to the tribe other than through inheritance from her.

**7.** The amendment to the tribal constitution relied on by plaintiff was adopted after the NIGC issued its opinion and therefore will not be considered

by the court in its review of the agency's decision.

**8.** Nothing in this ruling precludes plaintiff from resubmitting its management contract to the NIGC along with evidence of the current owners' consent and the newly adopted tribal amendment. Of course, the court does not pass on

sary to bring these owners under the jurisdiction of the tribe. *Duro v. Reina*, 495 U.S. 676, 693, 110 S.Ct. 2053, 2063–64, 109 L.Ed.2d 693 (1990) ("A tribe's ... authority comes from the consent of its members."). The court therefore concludes that plaintiff cannot establish the existence of jurisdiction through the membership of past or present owners of Reserve No. 35 in the Miami tribe.

III. *Order*

**IT IS THEREFORE BY THE COURT ORDERED** that the NIGC's determination that Reserve No. 35 is not "Indian land" pursuant to 25 U.S.C. § 2703(4) is affirmed.

**IT IS SO ORDERED.**

whether or not a new submission will obtain approval.