**MIAMI TRIBE OF OKLAHOMA,**
**Plaintiff,**

v.

**UNITED STATES of America,**
**et al., Defendants.**

**No. 97–2396–JWL.**

United States District Court,
D. Kansas.

May 8, 1998.

Kip A. Kubin, Payne & Jones, Chtd., Overland Park, KS, for Plaintiffs.

Christina L. Medeiros, Office of United States Attorney, Kansas City, KS, for Defendants.

## *MEMORANDUM AND ORDER*

LUNGSTRUM, District Judge.

This action arises under the federal Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701–2721. Pursuant to its authority under IGRA, the National Indian Gaming Commission (NIGC) denied approval of a class II gaming management contract submitted by plaintiff Miami Tribe of Oklahoma (the Tribe) on the ground that the proposed site for the gaming operation did not constitute "Indian lands," as required under IGRA. The Tribe now seeks judicial review of that decision.[1] For the reasons set forth below, the court concludes on the record that is before it that the agency abused its discretion in denying approval for the management contract. The matter is therefore remanded to the NIGC for further proceedings.

### I. Background

In 1995, the NIGC disapproved a class II gaming management contract between the Tribe and Butler National Service Corpora-

---

1. This order concerns only count I of the Tribe's complaint. On November 26, 1998, the court ordered that defendants could file a motion to dismiss count II (breach of fiduciary duty) within 30 days after the court's ruling on count I.

tion. The NIGC relied in part on an opinion from the Department of the Interior (DOI) that the proposed site for the gaming operation, the Maria Christiana Miami Reserve No. 35 (the Reserve), did not constitute "Indian lands", which IGRA defines as trust or restricted land "over which an Indian tribe exercises governmental power." 25 U.S.C. § 2703(4). The Tribe appealed that decision to this court.

On April 10, 1996, the court issued a memorandum and order affirming the NIGC's decision. *See Miami Tribe of Okla. v. United States*, 927 F.Supp. 1419 (D.Kan.1996). The court first determined that the NIGC's interpretation of the "Indian lands" definition to require jurisdiction was permissible. *Id.* at 1423. The court then reviewed the history of the Reserve and concluded that the Tribe had relinquished its jurisdiction over the Reserve by 1884 and, furthermore, that Congress had expressly abrogated the Tribe's jurisdiction by 1924. *Id.* at 1424–27. The court also concluded that jurisdiction could not arise from membership of the current owners of the Reserve because the owners were not in fact members of the Tribe at the time of the agency decision under review. *Id.* at 1427. The court did not consider the effect of steps taken toward membership after the agency's decision. *Id.* at 1427–28.

On March 14, 1996, pursuant to an amendment in the Tribe's constitution, the owners of the Reserve were admitted as members of the Tribe. On April 16, 1996, the owners leased the Reserve to the Tribe for purposes of a gaming operation; in the lease agreement, the owners consented to jurisdiction of the Tribe over the Reserve.

On June 18, 1996, the Tribe requested that the NIGC reconsider its earlier disapproval in light of the new membership of the owners of the Reserve. On July 1, 1996, the NIGC again requested an opinion from the DOI on the issue of "Indian lands" under IGRA. The Tribe, through its attorney, submitted two briefs to the DOI in support of its position.

On May 12, 1997, the Solicitor of the DOI issued his opinion that the Reserve did not qualify as "Indian lands" under IGRA. The Solicitor concluded that "the admission of the owners of the land into the Tribe is alone not sufficient evidence of tribal authority to bring the land within the definition of 'Indian lands' under IGRA." The Solicitor then reviewed the history of the Tribe's relationship to the Reserve. Next, the Solicitor cited *Cheyenne River Sioux Tribe v. State of South Dakota*, 830 F.Supp. 523, 528 (D.S.D.1993), *aff'd*, 3 F.3d 273 (8th Cir.1993), in which the district court, in denying summary judgment on the issue, suggested the following factors that may be relevant in determining whether a tribe "exercises governmental power" over a location:

> (1) whether the areas are developed; (2) whether tribal members reside in those areas; (3) whether any governmental services are provided and by whom; (4) whether law enforcement on the lands in question is provided by the Tribe or the State; and (5) other indicia as to who exercises governmental power over those areas.

The Solicitor concluded as follows:

> In the case of the Maria Christiana allotment [the Reserve], the land was originally allotted in 1859 to a nonmember of the Tribe. It is some distance from the Tribe's headquarters. Until the adjoining landowner recently provided the Tribe with access, it was inaccessible. It remains undeveloped. No member of the Tribe resides on the land. Until very recently, there had been no tribal oversight. The heirs of the original allottee were not members of the Tribe until 1996 when they were adopted because of their ownership interest in the land. The Miami Tribe of Oklahoma agreed by treaty to move to Oklahoma and cede its interest in this land. The Miami Tribe of Oklahoma did not allege governmental power over the land in the early 1990's and there is no agreement by local jurisdictions that the Tribe has civil and regulatory jurisdiction over the land. Finally, the Miami Tribe of Oklahoma twice received compensation from the United States based on the loss of this land. The initial payment compensated the Tribe for the land; the second payment compensated the Tribe for unpaid interest on the initial payment. Considering all these circumstances leads us to the

conclusion that the Miami Tribe does not exercise governmental powers over the Maria Christiana Reserve No. 35 within the meaning of IGRA.

To join the issue, the Tribe actually submitted the management contract to the NIGC for approval on June 11, 1997. On July 23, 1997, the NIGC disapproved the contract on the basis that the Reserve was not "Indian lands" as required under IGRA; the NIGC deferred to the DOI opinion on that issue. On August 14, 1997, the Tribe brought the instant suit by which it seeks review of the NIGC's decision.[2] On January 23, 1998, the Tribe filed its appeal brief to place the question of the agency's "Indian lands" ruling at issue.

## II. Standard of Review

■ The Chairman of the NIGC disapproved the management contract pursuant to 25 U.S.C. § 2711. That decision is appealable to this court under 25 U.S.C. § 2714 and the Administrative Procedure Act (APA), 5 U.S.C. § 702.

■ The parties have spent substantial portions of their briefs arguing about whether the court should pay deference to the agency's decision pursuant to *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In arguing that no deference is due here, the Tribe points to *Southern Ute Indian Tribe v. Amoco Production Co.,* 119 F.3d 816 (10th Cir.1997), in which the Tenth Circuit held that deference under *Chevron* to an agency interpretation of a statute that it administers is appropriate only if that interpretation is rendered by way of legislative rule or adjudication. *Id.* at 832–33. What both parties overlook, however, is that the interpretation here was made in the context of an adjudication, specifically, the adjudication of the Tribe's application for approval of its management contract. As the court stated in *Miami Tribe I,* this deferential standard "is the same whether the agency interpretation is performed through rule-making or, as here, informal adjudication."

*Miami Tribe I,* 927 F.Supp. at 1423 (quoting *Arco Oil & Gas Co. v. EPA,* 14 F.3d 1431, 1433 (10th Cir.1993)).

■ Although the applicability of *Chevron* here entitles the NIGC to deference regarding its interpretation of the statute, that, of course, does not end the inquiry. The court's review of the final agency decision in this case is also governed by the APA, specifically 5 U.S.C. § 706(2)(A), which requires the court to set aside an agency action found to be "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law." There is no contention here that the NIGC exceeded the scope of its authority or failed to comply with prescribed procedures; the court must therefore determine whether the action was otherwise arbitrary, capricious, or an abuse of discretion. *See Olenhouse v. Commodity Credit Corp.,* 42 F.3d 1560, 1574 (10th Cir.1994). Thus, even if the court defers to the agency's interpretation of the statutory definition, it must still examine the agency's decision to determine whether the agency's conclusions based on that interpretation pass muster under the APA.

■ Under the arbitrary and capricious standard, the court "must determine whether the agency considered all relevant factors and whether there has been a clear error of judgment." *Id.* (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

> Agency action will be set aside "if the agency relied on factors which Congress has not intended for it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Id.* (quoting *Motor Vehicle Mfrs.,* 463 U.S. at 43, 103 S.Ct. 2856). The Tenth Circuit further explained the standard as follows:

---

**2.** The parties stipulated that the July 23 decision was final and that all necessary administrative

remedies have been exhausted.

Because the arbitrary and capricious standard focuses on the rationality of an agency's decisionmaking process rather than on the actual decision, it is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself. Thus, the grounds upon which the agency acted must be clearly disclosed in, and sustained by, the record. The agency must make plain its course of inquiry, its analysis and its reasoning. After-the-fact rationalization by counsel in briefs or argument will not cure noncompliance by the agency with these principles. If the agency has failed to provide a reasoned explanation for its action, or if limitations in the administrative record make it impossible to conclude the action was the product of reasoned decisionmaking, the reviewing court may supplement the record or remand the case to the agency for further proceedings.

*Id.* at 1575 (citations omitted). Finally, "[i]n addition to requiring a reasoned basis for agency action, the 'arbitrary and capricious' standard requires an agency's action to be supported by the facts in the record." *Id.*

### III. Application of Arbitrary and Capricious Standard

█ The pivotal issue in this case is whether the Reserve constitutes "Indian lands" as required in IGRA. That term is defined in the statute to mean

(A) all lands within the limits of any Indian reservation; and

(B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.

25 U.S.C. § 2703(4). The Reserve is not within the limits of an Indian reservation. The parties agree, however, that the first requirement of part (B) of the definition— that the Reserve be trust or restricted

land—is met here by virtue of the Reserve's status as an allotment. Thus, the only remaining question is whether the Tribe "exercises governmental power" over the Reserve.[3]

Under *Chevron,* the court analyzes the interpretation of the phrase "exercises governmental power" here under a two-part inquiry. With respect to the first part of the test, *see Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778, the court has already concluded that Congress has not directly spoken to the meaning of this phrase. *Miami Tribe I,* 927 F.Supp. at 1423. The court then must determine whether the agency's interpretation is based on a permissible construction of the statute. *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778.

The case law considering this phrase is sparse. In *Cheyenne River,* the district court denied summary judgment to both parties on the question of whether the Indian tribe in that case exercised governmental power over the location at issue. 830 F.Supp. at 528. The court stated:

There is nothing in the record to determine: (1) whether the areas are developed; (2) whether tribal members reside in those areas; (3) whether any governmental services are provided and by whom; (4) whether law enforcement on the lands in question is provided by the Tribe or the State; and (5) other indicia as to who exercises governmental power over those areas.

*Id.* The DOI opinion noted these factors. On appeal, the Eighth Circuit upheld the district court's denial of summary judgment without commenting further on the meaning of the phrase "exercises governmental power." *Cheyenne River,* 3 F.3d at 280.

The First Circuit has also commented on the "exercises governmental power" requirement. That court stated:

In addition to having jurisdiction, a tribe must exercise governmental power in order to trigger the Gaming Act.[4] Meeting

---

3. The Tribe has not challenged the DOI's interpretation of part (B) to mean that the requirement that the Indian tribe exercise governmental

power over the land applies to both trust and restricted land. *See* 25 C.F.R. § 502.12.

4. The First Circuit based its requirement of both jurisdiction and the exercise of governmental

this requirement does not depend upon the Tribe's theoretical authority, but upon the presence of concrete manifestations of that authority.

*State of R.I. v. Narragansett Tribe of Indians,* 19 F.3d 685, 702–03 (1st Cir.1994).

Certainly, then, the NIGC's construction of the statute to involve consideration of a number of factors under the totality of the circumstances is a permissible one, and the court therefore defers to that construction under *Chevron.* The Tribe argues that jurisdiction alone should satisfy the "exercise of governmental power" requirement. Given the First Circuit's language in *Narragansett Tribe,* a construction requiring *more* than mere jurisdiction or theoretical authority by a tribe over a parcel of land would be permissible. The Tribe's position is further undermined by the fact that Congress used (and separately defined) the term "Indian lands" instead of "Indian country", the term generally used to define the limits of a tribe's jurisdiction. *See Mustang Production Co. v. Harrison,* 94 F.3d 1382, 1385 (10th Cir.1996) (tribal jurisdiction determined by status as Indian country).

Having concluded that the NIGC employed a permissible interpretation of the statute, the court turns to the NIGC's application of the statute to the case at hand. This is where the court believes the problems arise. First, the continued reference to the parcel's history in the DOI opinion leaves unclear the extent to which and for what purpose the NIGC considered that history. In *Miami Tribe I,* the court concluded that the history of the Reserve did not supply the jurisdiction over that land required by the NIGC and DOI. The Tribe now contends, however, that jurisdiction has arisen from the Reserve owners' membership in the Tribe. That argument, which the NIGC did not directly address, appears facially sound. *Mustang Production,* 94 F.3d at 1385 ("Indian tribes have jurisdiction over lands that are Indian country, and allotted lands consti-

tute Indian country."). Thus, the Tribe argues that it has established jurisdiction without reference to and despite the history of the Reserve by virtue of events that occurred subsequent to the events on which *Miami Tribe I* turned.

If jurisdiction were established, based on these subsequent events, the court would find that the history of the parcel, at least that part dealing with the cession of the land and the Tribe's receipt of compensation, is irrelevant; the only inquiry under the statutory definition of "Indian lands" would be whether the tribe exercises—in the present—governmental power over the land. Thus, to the extent the NIGC and DOI conceded that jurisdiction has been satisfied here, the court believes that they considered improper factors when they cited the history of the Reserve as a basis for their decision.

But there's the rub—the court cannot determine whether the NIGC and DOI, in once again concluding that the Reserve is not "Indian lands", found that the Tribe still had not established jurisdiction over the Reserve.[5] The DOI opinion did not state specifically that jurisdiction was still lacking, but instead focused on whether the Tribe exercises governmental power. The references to history in the opinion may evidence an implicit argument by the NIGC and DOI that the Tribe did not assume jurisdiction over the Reserve by virtue of the owners' new membership in the Tribe. But if that is indeed the basis on which the management contract was disapproved, the decision must be overturned as arbitrary and capricious because the decision-maker has not provided a "reasoned explanation" why the Tribe cannot obtain jurisdiction in the way it has proposed. *See Olenhouse,* 42 F.3d at 1575. The DOI opinion's continued reliance on history seems in fact to ignore the Tribe's argument that jurisdiction exists here despite history. If the NIGC and DOI believe that jurisdiction cannot be obtained in that way, it should

---

power on IGRA's provision for gaming "on Indian lands within such tribe's jurisdiction." *See* 25 U.S.C. § 2710(b)(1).

**5.** Defendants appear to argue in their brief that jurisdiction is still wanting, but, as stated above,

"an agency's action must be upheld, if at all, on the basis articulated by the agency itself," and not on a basis argued in a brief. *Olenhouse,* 42 F.3d at 1575 (quoting *Motor Vehicle Mfrs.,* 463 U.S. at 50, 103 S.Ct. 2856).

at least explain its reasoning in that regard. If on the other hand, they concede that jurisdiction has been satisfied, then history concerning the Tribe's cession of the land and receipt of compensation should no longer play a role in the agency's determination.

Second, the DOI opinion also contains no reference to the tribal ordinances and other activities that the Tribe asserts are examples of their actually and concretely exercising governmental power. It thus appears to the court that the NIGC and DOI "entirely failed to consider an important aspect of the problem." *Id.* at 1574 (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43, 103 S.Ct. 2856). It may be that these activities are not enough in the eyes of the agency to constitute the exercise of governmental power, but they are contentions that require consideration. If they were considered but rejected by the agency, it needs to make an appropriate record to that effect.

Finally, the additional facts on which the NIGC and DOI relied—the undeveloped nature of the Reserve, the fact that no member resides there, the absence of an agreement with local jurisdictions—do not seem to have evidentiary support in the record compiled and filed in this case by defendants. It may well be that those stated facts are true and that they are entitled to great weight, but the court has not been shown that those actually are facts established in the record of the case.

Therefore, under the standard set out by the Tenth Circuit in *Olenhouse* and repeated above, the court must conclude that the decision to disapprove the Tribe's management contract based on the conclusion that the Reserve does not constitute "Indian lands" must be set aside as an abuse of discretion. Because "the agency has failed to provide a reasoned explanation for its action" and "limitations in the administrative record make it impossible to conclude the action was the product of reasoned decisionmaking," the court remands this issue to the NIGC for further proceedings. *See id.* at 1575.[6]

IT IS THEREFORE ORDERED BY THE COURT THAT the decision by the NIGC to deny approval of the management contract submitted by the Tribe on the basis that the proposed gaming site does not constitute "Indian lands" is reversed, and proceedings related to that submission are remanded to the agency.

IT IS FURTHER ORDERED THAT a telephone status conference to discuss procedural matters arising out of this order shall be set for May 15, 1998, at 10:30 a.m. The court shall initiate the telephone call.

IT IS SO ORDERED.

---

6. The court will not grant the Tribe's request that the court order the NIGC to approve the management contract; instead, the court believes that, given the deficiencies in the agency's deci-sion, remand is appropriate under *Olenhouse*. The Tribe has withdrawn the request in its complaint for an accounting of funds paid by Butler National Corporation.