FILED
United States Court of Appeals
Tenth Circuit

August 30, 2011

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MIAMI TRIBE OF OKLAHOMA,

Plaintiff-Appellee,

v.

UNITED STATES OF AMERICA,
KENNETH SALAZAR, Secretary,
United States Department of the
Interior, LARRY ECHOHAWK,
Assistant Secretary of Interior, Bureau
of Indian Affairs,

Defendants-Appellants.

No. 10-3060

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. NO. 2:03-CV-2220-DJW)**

---

Ellen J. Durkee (Ignacia S. Moreno, Assistant Attorney General, and M. Alice
Thurston, United States Department of Justice, Environment & Natural Resources
Division, Appellate Section, Washington, District of Columbia, and Lanny D.
Welch, United States Attorney on opening brief, and Barry R. Grissom, United
States Attorney on reply brief, and David D. Zimmerman, Assistant United States
Attorney, District of Kansas, Kansas City, Kansas, with her on the briefs), United
States Department of Justice, Environment & Natural Resources Division,
Appellate Section, Washington, District of Columbia, for Appellants.

Christopher J. Reedy (Kip A. Kubin, Bottaro, Morefield & Kubin, L.C., Kansas
City, Missouri, with him on the brief) Olathe, Kansas, for Appellee.

---

Before **TYMKOVICH**, **McKAY**, and **GORSUCH**, Circuit Judges.

**TYMKOVICH**, Circuit Judge.

This appeal requires us to consider whether the Bureau of Indian Affairs (BIA) properly exercised its discretion to reject a gift of property by a member of the Miami Tribe of Oklahoma to the tribe.

James Smith wanted to transfer to the tribe a portion of his property interest in the Maria Christiana Reserve No. 35, located southwest of Kansas City, where the tribe has plans to develop gaming facilities. Federal law and restrictions on Smith's fee interest required the BIA to approve any transfer. Citing concerns regarding fractionation of the land interests in the Reserve as well as the long-range best interests of Reserve landowners, the BIA denied Smith's application to transfer the land. Miami Tribe challenges that decision. We hold the BIA properly exercised its discretion in denying the application.

This appeal also raises a novel jurisdictional question regarding our review of administrative decisions following a remand from district court. In this case, we conclude the government has not abandoned its right to challenge the district court's remand order, even though the government substantially prevailed in the district court's final judgment.

For the reasons set forth below, we find the district court erred in its remand order reversing the BIA's denial of Smith's application. Therefore we VACATE the district court's final judgment and its order reversing the BIA, and

we REMAND for further consideration of Smith's application consistent with this opinion.

## I. Background

The Maria Christiana Reserve No. 35 (Reserve)[1] is a 35-acre parcel of land located in Miami County, Kansas. It is approximately 180 miles from Miami Tribe's current land-base in Ottawa County, Oklahoma. Because it bears on the merits of this appeal, we review the relevant portions of the complicated history of Miami Tribe's emigration to, and eventual departure from, the Reserve.[2]

### A.    History of the Reserve

The origins of the Reserve trace back to 1838. Through a treaty with Miami Tribe, the United States set aside land west of the Mississippi River with the implied understanding that the tribe, then located in Indiana, would emigrate there. *See* Treaty with the Miamies, 7 Stat. 569, 571 (Nov. 6, 1838). In 1840, the tribe ceded all its land in Indiana and agreed to move to land in Kansas, which the United States Senate had designated. *See* Treaty with the Miamies, 7 Stat. 582, 582–85 (Nov. 28, 1840).

---

[1] The Reserve is variously known as the Maria Christiana allotment, Miami Reserve No. 35, Miami 35, Allotment No. 35, and Maria Christiana Miami Reserve No. 35. We consider all to refer to the same 35-acre parcel of land in Miami County, Kansas.

[2] Additional details on the history of the Reserve can be found in a thorough district court opinion from a separate case involving Miami Tribe and the Reserve. *See Miami Tribe of Okla. v. United States*, 927 F. Supp. 1419, 1424–26 (D. Kan. 1996).

The tribe moved to the land in Kansas in 1846, but a large number of tribal members remained in Indiana and severed their relationship with the tribe. *See Miami Tribe of Okla. v. United States*, 281 F.2d 202, 213 (Ct. Cl. 1960); 17 Op. Att'y Gen. 410, 411–12 (1882). The Miami Tribe was split into two groups: (1) the Western Miamis, who emigrated to Kansas and were considered part of Miami Tribe, and (2) the Indiana Miamis, who remained in Indiana and were no longer members of the tribe. *See* 12 Op. Att'y Gen. 236, 239 (1867).

In 1854, the Western Miamis ceded all but 70,640 acres of their land in Kansas to the United States in return for payments to the tribe and other investments. *See* Treaty with the Miami Indians, 10 Stat. 1093, 1093 (June 5, 1854). The 1854 treaty acknowledged the division of Miami Tribe into two groups—Western Miamis and Indiana Miamis—after its move to Kansas and excluded the Indiana Miamis from receiving payment for the ceded Kansas lands. *Id.* at 1094–95. The 1854 treaty, however, did divide up payments still owed to the Western and Indiana Miamis from the 1840 treaty. *Id.* at 1095. Only Indiana Miamis who were on an agreed-upon list, which could be modified only with the consent of the Indiana Miamis, would receive payment. *Id.* at 1099.

In 1858, several families, including that of Maria Christiana DeRome, petitioned Congress to be included on the list of Indiana Miamis who would receive payments under the 1840 treaty. The DeRome family were excluded from the 1854 list because they were not considered of Miami blood. *Miami Tribe of*

*Okla. v. United States*, 927 F. Supp. 1419, 1424 (D. Kan. 1996) (citing H.R. Exec. Doc. No. 23, 49th Cong., 1st Sess. 1, 6 (1886)). In a unilateral decision, Congress added the petitioners to the list.[3] *See* Act of June 12, 1858, 11 Stat. 329, 332. Congress also directed that each individual receive a portion of the unpaid annuity payments and be allotted 200 acres of land from the 70,640 retained by the tribe in Kansas. *Id.* That is, these individuals were given land retained by the Western Miamis even though the individuals were not Western Miamis, or even considered of Miami blood. In 1859, the Reserve was patented as a restricted Indian allotment of 200 acres.[4] It was from this allotment that the Maria Christiana Reserve No. 35 was created.

---

[3] By 1867, the names added by Congress in 1858 had been removed from the list. *See Miami Tribe of Okla.*, 927 F. Supp. at 1425 n.4; 12 Op. Att'y Gen. 236, 244 (Sept. 20, 1867).

[4] There are two types of allotments: (1) a "trust allotment," which is "a parcel of land owned by the United States in trust for an Indian," or (2) a "restricted allotment," which is "owned by an Indian subject to a restriction on alienation in the United States or its officials." COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 16.03[1] (2005 ed.). A trust allotment is conveyed through a trust patent, under which the United States holds the land for a designated period in trust for the sole use and benefit of the allottee and conveys the land in unrestricted fee at the end of the trust period. *See United States v. Bowling*, 256 U.S. 484, 486–87 (1921). A restricted allotment, similarly, is conveyed through a land patent, under which the allottee holds the land in fee with a restriction on alienation. *See id.* at 487. The Reserve's land patent for the restricted allotment provided the land "shall never be sold or conveyed by the grantee or her heirs without the consent of the Secretary of the Interior, for the time being." *See Miami Tribe of Okla. v. United States*, 679 F. Supp. 2d 1269, 1278 (D. Kan. 2010).

Several years later the Miami Tribe, now consisting only of the Western Miamis, entered into a treaty encouraging it to move from Kansas to Oklahoma. *See* Treaty with the Peorias, Kaskaskias, et. al., 15 Stat. 513, 520 (Feb. 23, 1867). Congress agreed to purchase the Western Miami's unallotted lands in Kansas if the tribe signified its interest in selling, which it did. *See* Act of Mar. 3, 1873, 17 Stat. 631, 631. Those who remained in Kansas could, meeting certain requirements, become United States citizens, but would end their membership in the tribe. *Id.* at 632. Those members who moved to Oklahoma retained their tribal membership. *Id.*

Through that same 1873 legislation, Congress directed the Secretary of the Interior to take a census of the Western Miamis and determine who was entitled to the lands and monies set aside for the Western Miamis from the sale of their land in Kansas through the 1854 treaty. *Id.* In compiling this census, the individuals added by Congress in 1858 to the list of Miami Indians were not included. *Id.* at 632–33. These Miami Indians were not considered members of the Western Miamis and only Western Miamis were entitled to payment under the 1854 treaty. *See* 17 Op. Att'y Gen. 410, 414–15 (July 7, 1882). Those not on the census were not entitled to share in the proceeds from the lands sold under the 1873 legislation or from the annuities in the 1854 treaty. *Id.* Again, the legislation reinforced that individuals, such as Maria Christiana DeRome, were

not part of the Western Miamis, who had settled in Kansas and eventually moved to Oklahoma.

In 1891, after a petition to Congress and an action before the Court of Claims, the United States reimbursed the Western Miamis for the money erroneously paid as back annuities to the individuals erroneously added in 1858 as well as for the value of the land allotted to them. *See Miami Tribe of Okla.,* 281 F.2d at 212. Fast forwarding to 1960, the Western Miamis again brought suit in the Court of Claims, seeking interest on the payments made in 1891. The court awarded interest from the time of the erroneous payments (1858) and allotments (1859) until 1891. *Id.*

For this appeal, the most important fact is that Maria Christiana DeRome was not a member of the Western Miamis and should not have received the allotment of land that became the Reserve. In fact, Miami Tribe was reimbursed by the United States for the land improperly allotted to non-members—including the Reserve allotted to Maria Christiana DeRome.

B.    Smith's Gift Transfer

Smith holds a 3/38 undivided restricted fee interest in the 35-acre Reserve.[5] While the Department of the Interior has found it "not entirely clear" how

_____

[5] Over time, the original 200-acre allotment dwindled to its current size of 35 acres. After Maria Christiana DeRome's death in 1860, her family sold 120 acres. In 1986, based on a claim of adverse possession, a court partitioned the remaining 80 acres, granting 45 acres to Midwest Investment Properties, Inc. and leaving 35 acres to the Indian landowners in restricted fee. *See* Aple. App. at 4.

interests in the Reserve descended to the many heirs of Maria Christiana DeRome, it is undisputed that Smith inherited his interest as an heir of DeRome and shares his interest with over 20 other landowners.[6] Aplt. App. at 149–50; *see also id.* at 171–78 (June 2009 BIA Title Status Report listing current interest-holders in the Reserve).

Smith is also a member of Miami Tribe. In 1996, to strengthen its connection with the Reserve, the tribe amended its constitution and adopted all current Reserve landowners, enlisting them as tribal members. Then, in 2001, Smith decided to give a portion of his interest to the tribe, ostensibly as a benefit to the tribe and its members. Because the land was held in restricted fee, as we describe in greater detail below, federal law required the BIA to approve the transfer. Smith applied to the BIA for approval to convey by gift 1/3 of his 3/38 undivided interest (i.e. 1/38 interest) in the Reserve to Miami Tribe.

The BIA denied Smith's application for two reasons. It found the transfer (1) was not in the long-range best interests of Smith or other Reserve landowners, and (2) conflicted with the federal government's policy of avoiding further fractionation of interests in Indian lands. Smith appealed to the Interior Board of

---

[6] While not at issue in this appeal, Smith also holds a 3/19 restricted beneficial life estate interest in the Reserve. Aplt. App. at 170. Smith acquired this interest in 2007 through a probate proceeding upon the death of his aunt, Earline Smith Downs. *Id.* at 169–70. Miami Tribe holds the remainder interest in Smith's life estate. *Id.* at 169.

Indian Appeals (IBIA) of the United States Department of the Interior, which affirmed the BIA's decision.

    C.    Federal Court Proceedings

Miami Tribe brought suit in federal district court challenging the BIA's denial of Smith's application on various statutory and constitutional grounds.[7] The primary challenge was under the Administrative Procedures Act (APA), which was bifurcated from the other claims so it could be addressed first.

Following bifurcation, the district court issued an order (2005 Order) with respect to the APA claim and reversed the BIA's decision. The district court found the BIA's decision was arbitrary and capricious, and contrary to law, because (1) Smith, as a tribal member, possessed a special relationship with Miami Tribe, (2) the BIA failed to consider the long-range best interests of the tribe, and (3) Miami Tribe exercised jurisdiction over the Reserve, which brought the gift within the federal government's policy encouraging such transfers. The court remanded the matter to the BIA with instructions to approve Smith's application, while acknowledging other claims still remained pending before the district court.

---

    [7] Miami Tribe has been involved in myriad litigation regarding the Reserve. *See Miami Tribe of Okla. v. United States*, 927 F. Supp. 1419 (D. Kan. 1996); *Miami Tribe of Okla. v. United States*, 5 F. Supp. 2d 1213 (D. Kan. 1998); *Kansas ex rel. Graves v. United States*, 86 F. Supp. 2d 1094 (D. Kan. 2000); *Kansas v. United States*, 249 F.3d 1213 (10th Cir. 2001).

The BIA objected and filed a motion requesting the district court reconsider its decision and affirm the BIA's decision. In the alternative, the government requested the court remand the matter to the BIA for its consideration, rather than outright reversing the BIA with instructions to approve Smith's application.

The district court granted in part and denied in part the government's motion and modified its 2005 Order. Rather than mandate the BIA approve Smith's application on remand, the court remanded the case to the BIA for further proceedings "consistent" with the 2005 Order. Specifically, the court remanded the case for the BIA to consider the long-term impact of Smith's proposed transfer on the further fractionation of the Reserve.

Given the procedural posture it faced, the BIA filed a notice of appeal seeking our review of the 2005 Order and the order on reconsideration. Before any briefing, however, the BIA shifted gears and moved to voluntarily dismiss the appeal. It conceded

> [T]hat significant questions could be raised with respect to the appealability of the [2005 Order] in its present form. We want to ensure that any appeal is focused on the merits of this action rather than on issues of appellate jurisdiction . . . . Accordingly, federal defendants intend to seek a Rule 54(b) judgment in district court and, if granted, file a new notice of appeal.

Amended Motion to Voluntarily Dismiss Appeal at 1, *Miami Tribe of Okla. v. United States*, No. 06-3037 (10th Cir. Apr. 24, 2006).

After dismissal of the appeal, the district court stayed the remaining two counts pending the BIA's disposition on remand. The court determined resolution of the issue on remand would simplify the remaining issues before the court and promote judicial economy. At this point, the BIA requested a Rule 54(b) judgment as to the 2005 Order from which the government could take an immediate appeal. The BIA argued the district court had already decided to stay the remaining counts and resolve the APA count to simplify the issues and promote judicial economy. Any potential harm from piecemeal litigation, it contended, would be outweighed by resolving the APA claim on the merits first. The tribe opposed the motion, asserting the 2005 Order was not a final decision and the government's request was untimely.

The district court denied the government's request for several reasons. The court, first, found the 2005 Order was not an ultimate disposition of a claim and the remand order "fully contemplates further proceedings once the BIA issues its decision upon remand." Aplt. App. at 78. Second, the 2005 Order was not distinct and separable from the two unresolved claims, and the BIA's decision on remand would likely affect future determination of those claims. Third, denying the motion follows the general rule that administrative-remand orders are ordinarily not appealable because they are non-final decisions. The district court found the exceptions to this rule did not apply because the government failed to show either that the 2005 Order resolved a serious and unsettled question or that

-11-

it was foreclosed from future appellate review of the issues. Finally, the government's motion was filed ten months after the 2005 Order was issued and the court found this excessive delay justified its denial. The BIA did not seek to appeal this order.

On remand, the BIA approved Smith's application but denied his request to convey the land in trust status because Smith held the land in restricted fee, not trust.[8] The BIA stated the tribe needed to submit a fee-to-trust application, which it had not, before the BIA would accept the land in trust status for the tribe. *See generally* 25 C.F.R. part 151. The IBIA affirmed the BIA's decision.

Miami Tribe returned to federal court to challenge this decision. The tribe filed a two-count amended complaint alleging the BIA's refusal to transfer Smith's interest in trust (1) violated the Indian Land Consolidation Act (ILCA), and (2) was a breach of trust. The district court affirmed the BIA's order and dismissed the tribe's breach of trust claim. *See Miami Tribe of Okla. v. United States*, 679 F. Supp. 2d 1269 (D. Kan. 2010).

With the entry of a final judgment, the government filed a notice of appeal seeking review of the district court's 2005 Order reversing the BIA's initial denial of Smith's application.

---

[8] Whether land is held in restricted fee or trust can determine whether the land is eligible for gaming under federal Indian gaming laws. *See* G. William Rice, *Some Thoughts on the Future of Indian Gaming*, 42 ARIZ. ST. L. J. 219, 241–44 (2010).

## II. Discussion

The BIA urges us to reverse the 2005 Order because the BIA's decision to deny Smith's application was properly within its discretion. It also argues the tribe lacks jurisdiction over the Reserve, and further, that denying Smith's transfer does not conflict with federal government policy promoting consolidation of tribal lands.

The tribe in turn argues we lack jurisdiction because the BIA cannot appeal the district court's decision affirming the BIA's own determination. It also contends the 2005 Order was correct because the tribe has jurisdiction over the Reserve and the BIA's fractionation concerns were unfounded.

First we consider our appellate jurisdiction before turning to the merits.

### A.    Appellate Jurisdiction

Miami Tribe claims we lack jurisdiction because the government's appeal of the district court's final judgment affirming the BIA's decision presents no case or controversy.

The government responds that we have jurisdiction for several reasons. First, the government appeals from the first and only *final* judgment of the district court. Throughout the remand and subsequent district court proceedings, the government was clear it intended to appeal the 2005 Order. In its view, the final judgment of the district court on appeal here, even though it affirms the BIA's

decision on remand, is a direct and natural consequence of the unfavorable 2005 Order that controlled the BIA's decision on remand.

Second and relatedly, the government argues it could not appeal the 2005 Order any earlier. It notes administrative-remand orders—such as the 2005 Order—are generally not immediately appealable because they are non-final judgments. The government acknowledges the limited exception to this rule, which permits an immediate appeal when an agency is likely foreclosed from seeking future appellate review, but argues the exception does not apply here.

From this procedural posture, two jurisdictional questions present themselves. The first is whether the government—even after the BIA approved Smith's application on remand—has standing to challenge the 2005 Order. The government prevailed in the district court after remand because the court affirmed the BIA's approval of Smith's application. But the government claims the 2005 Order circumscribed its discretion, which made the outcome on remand inevitable, and therefore has standing to challenge the order now. So we must consider whether the government can appeal in these circumstances.

The second question is whether the government should have taken an immediate, interlocutory appeal of the 2005 Order, and whether the government's decision not to pursue an earlier appeal precludes its present challenge to the order.

We address each question in turn.

1.    BIA Appeal of the 2005 Order

We first consider whether the BIA has standing to challenge the 2005 Order through an appeal from the district court's final judgment.

It is bedrock law that we have jurisdiction over all final decisions of federal district courts under 28 U.S.C. § 1291.  This jurisdiction is generally contingent upon "the existence of a decision by the District Court that ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 467 (1978) (quotations omitted). With a final judgment from a district court, "a notice of appeal which names the final judgment is sufficient to support review of all earlier orders that merge in the final judgment." *McBride v. CITGO Petroleum Corp.*, 281 F.3d 1099, 1104 (10th Cir. 2002).  "[I]t is a general rule that all earlier interlocutory orders merge into final orders and judgments except when the final order is a dismissal for failure to prosecute." *Id.* (citing 16A Wright & Miller, FEDERAL PRACTICE & PROCEDURE § 3949.4 (3d ed. 1999 & Supp. 2001)).  Through an appeal of a final judgment, a party can obtain appellate review of both the final judgment and any interlocutory orders.

Generally, "only a party aggrieved by a judgment or order of a district court may exercise the statutory right to appeal," and thus a "party who receives all that he has sought generally is not aggrieved by the judgment affording the relief and cannot appeal from it." *Deposit Guaranty Nat'l Bank v. Roper*, 445

U.S. 326, 333 (1980). But in certain cases, an "appeal may be permitted from an adverse ruling collateral to the judgment on the merits at the behest of the party who has prevailed on the merits, so long as that party retains a stake in the appeal satisfying the requirements of Art. III." *Id.* at 334; *see also Amazon, Inc. v. Dirt Camp, Inc.*, 273 F.3d 1271, 1275 (10th Cir. 2001) ("[A] prevailing party is aggrieved and ordinarily can appeal a decision granting in part and denying in part the remedy requested." (quotation omitted)). Thus, if a party prevails in the final judgment of a district court, but has sustained an adverse ruling in a district court's prior interlocutory order, the party may still have standing to appeal under Article III.

A recent Supreme Court case is instructive. In *Camreta v. Greene*, 131 S. Ct. 2020 (2011), the Court considered an appeal by a prevailing party in the context of qualified immunity and Section 1983 suits for money damages. There, government officials were permitted to challenge a lower court's ruling that their conduct violated the Constitution, even though the Court also determined the officials were protected from liability by qualified immunity. *Id.* at 2029–30. The Court noted in certain circumstances it has "recognized that an appeal brought by a prevailing party may satisfy Article III's case-or-controversy requirement." *Id.* at 2028–29 (citing *Deposit Guaranty Nat'l Bank v. Roper*, 445 U.S. 326 (1980); *Elec. Fittings Corp. v. Thomas & Betts Co.*, 307 U.S. 241 (1939)). In such a situation, the "critical question under Article III" is whether a

party can demonstrate injury, causation, and redressability and therefore, despite being nominally the prevailing party, "retains the necessary personal stake in the appeal." *Camreta*, 131 S. Ct. at 2029.[9] The BIA meets these requirements in this appeal.

A central inquiry in assessing the BIA's continuing interest in an appeal challenging the 2005 Order is whether the order limited the BIA's discretion on remand.

"When an administrative agency has made an error of law, the duty of the Court is to correct the error of law committed by that body, and, after doing so to remand the case to the [agency] so as to afford it the opportunity of examining the evidence and finding the facts as required by law." *NLRB v. Enter. Ass'n of Pipefitters Local 638*, 429 U.S. 507, 522 (1977) (quotation omitted). Under the law of the case doctrine, on remand, an agency must abide by a district court's remand order. *See Poppa v. Astrue*, 569 F.3d 1167, 1170 (10th Cir. 2009). We have stated that

> [A]lthough primarily applicable between courts of different levels, the doctrine [of law of the case] and the mandate rule apply to judicial review of administrative decisions, and require the administrative agency, on remand from a court, to conform its further

---

[9] Even though it could hear an appeal by a prevailing party under Article III, the Court noted it generally declines to hear such appeals as "a matter of practice and prudence." *Camreta*, 130 S. Ct. at 2030. It chose to consider the appeal in *Camreta* in order to clarify a question of constitutional law guiding the conduct of government officials. *Id.* at 2032.

proceedings in the case to the principles set forth in the judicial decision, unless there is a compelling reason to depart.

*Copart, Inc. v. Admin. Review Bd., U.S. Dep't of Labor*, 495 F.3d 1197, 1201 (10th Cir. 2007) (quotation omitted); *see also* 3 ADMIN. L. & PRAC. § 8:31 (3d ed.) ("The 'law of the case' doctrine applies on remand and the agency is bound by findings and conclusions from the reviewing court if properly within judicial authority."). An agency may depart from the law of the case on remand under only a few narrow exceptions, none of which apply here. *See Grigsby v. Barnhart*, 294 F.3d 1215, 1219 n.4 (10th Cir. 2002) ("There are three 'exceptionally narrow' reasons to depart from the law of the case: (1) when the evidence in a subsequent trial is substantially different; (2) when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or (3) when the decision was clearly erroneous and would work a manifest injustice." (quotation omitted)).

Here, the law of the case doctrine required the BIA to conform its proceedings on remand to the 2005 Order. While the BIA failed to reference the 2005 Order in its decision on remand, neither party disputes the BIA had to comply with the legal standards it set forth. In doing so, the BIA in particular had to follow the order's directive to consider certain factors on remand. And although the district court amended its initial order—removing its mandate to

-18-

approve Smith's application[10]—it made clear the court understood the law required BIA approval of Smith's application. In this way, the BIA's discretion on remand was channeled through the limitations of the 2005 Order.

This case is not a situation where an agency exercised uncircumscribed discretion on remand and simply changed its mind. In such a case, the new decision would be solely due to the agency's discretionary action, not a court order. In contrast, here the BIA operated under the district court's interpretation of the law governing the BIA's approval process as set forth in the 2005 Order. While the BIA has discretion to approve land transfers—and arguably retained discretion on pain of contempt to deny the gift on remand[11]—it was bound by the district court's ruling that Miami Tribe had jurisdiction (which we discuss below) over the Reserve for the purposes of the ILCA. This finding required the BIA to

[10] Despite removing its command to approve the application, the district court expected the BIA's actions on remand to be "consistent" with the 2005 Order.

[11] At oral argument, the tribe asserted the BIA should have denied the conveyance a second time if it disagreed with the 2005 Order and then challenged the order through a contempt proceeding. We look unfavorably on forcing an agency to suffer a contempt citation as a vehicle for an appellate challenge to a district court's administrative-remand order. *See Occidental Petroleum Corp. v. S.E.C.*, 873 F.2d 325, 332 (D.C. Cir. 1989) ("[I]f the SEC is not permitted to appeal the district court's order now, it will be bound to proceed under the legal standard imposed by the district court. (Its only other choice would be to violate the court's order and risk contempt, which we do not think Congress, in enacting § 1291, intended to encourage, and which the SEC has not intimated it will do.)"); 15B Wright & Miller, FEDERAL PRACTICE & PROCEDURE § 3914.32 (2d ed.) ("[C]ourts also note the unseemliness of forcing a government agency to act in contempt so as to force an opportunity for immediate appeal.").

further a statutory preference expressed in 25 U.S.C. § 2216(a)—encouraging the consolidation of lands between Indians and tribes "that exercise[] jurisdiction over the land." That policy preference directly affected the BIA's calculus on remand.

The 2005 Order constrained the BIA's discretion on remand. Given these circumstances, the BIA retains a personal stake in the adverse, interlocutory 2005 Order to confer standing to appeal, even though the government nominally prevailed in the district court's final judgment.

2.     Interlocutory Appeal

The government initially sought an interlocutory appeal of the 2005 Order, and at first, this may appear to be the more prudent solution to the BIA's dilemma. But, under § 1291, a "remand by a district court to an administrative agency for further proceedings is ordinarily not appealable because it is not a final decision." *Bender v. Clark*, 744 F.2d 1424, 1426–27 (10th Cir. 1984).[12] Nonetheless, this "administrative-remand rule" is not without exception, and in certain circumstances an immediate appeal is possible. *Baca-Prieto v. Guigni*, 95 F.3d 1006, 1008 (10th Cir. 1996).

_____

[12] Nor did the district court issue a Rule 54(b) order certifying its partial ruling as a final judgment.

We have recognized a "practical finality rule" that operates as an important caveat to the general limitation on appeals from an administrative-remand order.[13] *Graham v. Hartford Life & Accident Ins. Co.*, 501 F.3d 1153, 1157 (10th Cir. 2007); *see also Baca-Prieto*, 95 F.3d at 1009 (noting the *Bender* line of cases is a "prudential limitation on the administrative-remand rule"). "The practical finality rule may be invoked when the lack of immediate review of an order for an administrative remand would violate basic judicial principles," *Graham*, 501 F.3d at 1157 (quotation omitted), namely issues that are both "urgent and important." *Trout Unlimited v. U.S. Dep't. of Agric.*, 441 F.3d 1214, 1218 (10th Cir. 2006). "If these two conditions are met, this court will apply a balancing test and assert jurisdiction if 'the danger of injustice by delaying appellate review outweighs the inconvenience and costs of piecemeal review.'" *Id.* (quoting *Bender*, 744 F.2d at 1427).

In practice, we have applied the practical finality rule "when it is necessary to ensure that we can review important legal questions which a remand may make effectively unreviewable, because administrative agencies may be barred from seeking district court (and thus circuit court) review of their own administrative decisions." *Graham*, 501 F.3d at 1158 (quotation omitted); *see also Baca-Prieto*,

---

[13]  The practical finality rule "borrows some concepts from the collateral order doctrine" but is broader and more practical in its application. *Graham v. Hartford Life & Accident Ins. Co.*, 501 F.3d 1153, 1158 n.3 (10th Cir. 2007); *see id.* ("We have contrasted the balancing test of the practical finality rule with the mechanical analysis of the collateral order doctrine.") (quotations omitted).

95 F.3d at 1010 (finding the remand order decided an important issue regarding INS exclusion jurisdiction and directed the decision on remand from which the INS would have no appeal); *Cotton Petroleum v. U.S. Dep't of Interior*, 870 F.2d 1515, 1521–22 (10th Cir. 1989) (noting the district court remand order resolved "threshold legal issues" and we based our decision both on the importance of the issue and the fact "delay in review . . . would likely result in further disputes and litigation, confusion and danger of injustice"). In cases where we determined we lacked jurisdiction, we found the issues insignificant or subject to future appellate review. *See Trout Unlimited*, 441 F.3d at 1219 (finding no reason compelling "urgent or immediate judicial consideration" because "delayed review will not [cause] injustice," and will not cause additional disputes and litigation).[14]

When we have heard interlocutory appeals under the practical finality rule, central to our analysis was a concern the agency likely would be foreclosed from future appellate review. That was not the case here. At the time of the 2005 Order, two counts of Miami Tribe's complaint remained pending before the

---

[14] Similarly, we have declined jurisdiction over appeals involving private litigants seeking immediate appeal of remand orders because the issues presented would be reviewable upon conclusion of the remand proceedings. *See Mesa Oil, Inc. v. United States*, 467 F.3d 1252, 1256 (10th Cir. 2006) ("[Abatement of financial] penalty decision is reviewable upon conclusion of the remanded proceedings irrespective of who prevails upon the [collection of] payment issue . . ."); *Trout Unlimited*, 441 F.3d at 1219 ("If the Forest Service's decision on remand is not satisfactory, Defendant-Intervenors can pursue administrative remedies and, if necessary, seek review in the district and appellate courts at a later stage in the proceedings.").

district court and had been stayed for further proceedings before the agency.[15]

Future appellate review likely was *not* foreclosed and the government's immediate appeal likely would not have fallen within the practical finality exception.

As a general matter, if additional proceedings in a district court are contemplated after remand to an agency—as here—we think the better rule is for the government to wait until a final judgment is entered. This comports with the final judgment rule's preference for a single appeal, even if the agency prevails on some of the claims on remand. The rule, moreover, avoids the perverse incentive encouraging an agency to seek an immediate appeal of a remand order (even if it was unlikely the case fell within the practical finality exception) if the agency had a whiff that we would take jurisdiction over the interlocutory appeal.

We have located one case, *Viraj Group, Ltd. v. United States*, 343 F.3d 1371 (Fed. Cir. 2003), with a similar procedural posture to that presented here. It also examined whether the government had standing to appeal when it prevailed

---

[15] The two outstanding, unresolved counts pending before the district court distinguish this case from the practical finality line of cases. In those cases, where we asserted jurisdiction and reviewed administrative-remand orders under the practical finality exception, all outstanding issues had been resolved by the district court. *See Baca-Prieto*, 95 F.3d at 1008; *Cotton Petroleum*, 870 F.2d at 1521. When denying the government's request for a Rule 54(b) judgment, the district court here noted there would be further proceedings and stated the unresolved counts would likely be affected by the BIA's decision on remand.

in the lower court's final judgment, but had previously sustained adverse

interlocutory orders remanding to the agency. The court observed the

> [A]ppeal comes to us in a strange posture: The government has
> appealed from the court's decision *affirming* the government
> agency's determination; in other words, the winner has appealed
> because its determination was affirmed by the trial court only on the
> basis of reasoning with which it disagrees.

*Id.* at 1375. The government asserted it had standing to appeal—even though it

was the prevailing party—because it could not appeal from the earlier remand

decisions based on the general rule that administrative-remand decisions are not

final judgments. Like here, *Viraj* raised the question of "whether the government

. . . should have appealed from one of the [lower court]'s earlier decisions, and

whether its failure to do so deprives it of standing in this appeal." *Id.* at 1376.

Addressing the government's situation, the court noted

> The fact that the government perhaps could have appealed from one
> of the court's earlier decisions creates a circular dilemma. To hold
> that the government could have appealed sooner, we must necessarily
> find that it cannot bring this appeal; and to hold that it cannot bring
> this appeal, we must find that it could have appealed sooner.

*Id.* The court went on to conclude that

> Rather than bootstrap our reasoning to reach those two conclusions
> we believe that the better course is to hold that the government has
> sufficient standing to bring this appeal. Even though technically the
> prevailing party under the [lower court]'s final decision, the government
> prevailed only because it acquiesced and abandoned its original position,
> which it had zealously advocated, and adopted under protest a contrary
> position forced upon it by the court. Thus, in substance, the government is
> truly the non-prevailing party in this case. To hold otherwise would exalt

form over substance. We therefore are satisfied that this appeal presents a case or controversy that we can address on the merits.

*Id.*

We find this reasoning persuasive and applicable. Given the procedural posture of this case, and the district court's inherent limitations on remand, the government is "truly the non-prevailing party" on the core issue of its statutory discretion and Miami Tribe's jurisdiction over the Reserve. We conclude we have jurisdiction to hear the government's challenge to the 2005 Order through its appeal from the district court's final judgment.

B.    Merits

Having assured ourselves we have jurisdiction to hear the government's appeal, we turn to the merits of the BIA's challenge to the 2005 Order.

Smith owned a 3/38 undivided restricted interest in the Reserve and applied to give 1/3 of his interest (i.e. 1/38 interest) to Miami Tribe. He wanted to make the gift because of his "desire to do something for the benefit of the Miami Tribe and its members." Aplt. App. at 132. The BIA denied Smith's application because (1) the gift transfer was not in Smith's or other Reserve landowners' long-range best interests, and (2) the transfer would conflict with the government's policy regarding fractionated interests in Indian land. In its 2005 Order, the district court reversed the BIA's decision, finding it arbitrary and capricious, and contrary to law. We disagree with this conclusion, finding the

-25-

BIA properly applied the applicable statutes and regulations when it denied Smith's application.

We review the district court's 2005 Order reversing the BIA de novo, and we will set aside agency action "only if we conclude that it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *McKeen v. U.S. Forest Serv.*, 615 F.3d 1244, 1253 (10th Cir. 2010) (quoting 5 U.S.C. § 706(2)(A)).  Agency action is arbitrary and capricious if it "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *United Keetoowah Band of Cherokee Indians of Okla. v. U.S. Dept. of Hous. & Urban Dev.*, 567 F.3d 1235, 1239 (10th Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

When reviewing an agency's interpretation of a statute, "[i]f Congress has spoken directly to the issue, that is the end of the matter; the court, as well as the agency, must give effect to Congress's unambiguously expressed intent." *United Keetoowah Band,* 567 F.3d at 1240 (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842–43 (1984)).  "If the statute is silent or ambiguous, we proceed to . . . ask 'whether the agency's answer is based on a permissible construction of the statute.'" *Id.* (quoting *Chevron*, 467 U.S. at 843).

When answering that question, we "afford considerable deference to agencies interpreting ambiguities in statutes that Congress has delegated to their care." *Hydro Res., Inc. v. EPA*, 608 F.3d 1131, 1145 (10th Cir. 2010) (en banc). "Deference is especially due when an agency's interpretation of a statute rests upon its considered judgment, a product of its unique expertise." *Qwest Commc'n Int'l., Inc. v. FCC*, 398 F.3d 1222, 1230 (10th Cir. 2005).

When considering agency action made pursuant to its own regulations, we do not "decide which among several competing interpretations best serves the regulatory purpose," but rather "give substantial deference to an agency's interpretation of its own regulations." *Morris v. U.S. Nuclear Regulatory Comm'n*, 598 F.3d 677, 684 (10th Cir. 2010). The agency's interpretation will control "unless 'plainly erroneous or inconsistent with the regulation.'" *Plateau Mining Corp. v. Fed. Mine Safety & Health Review Comm'n*, 519 F.3d 1176, 1192 (10th Cir. 2008) (quoting *Auer v. Robbins*, 519 U.S. 452, 461, (1997)).

At the outset, we also note the overarching regulatory framework governing a gift of Indian land. In the Indian Land Consolidation Act (ILCA), the United States stated its policy of encouraging the consolidation of Indian land ownership and preventing further fractionation of Indian lands. *See* 25 U.S.C. §§ 2201 note, 2216(a). Under the ILCA, the Secretary of the Department of the Interior "is authorized in his discretion, and upon application of the Indian owners . . . to approve conveyances, with respect to lands or interests in lands held by individual

-27-

Indians." *Id.* § 483. An Indian may give an interest in land to a tribe "for an amount less than the fair market value of that interest." *Id.* § 2216(b). Such a gift is a two-part transaction consisting of the disposal and acquisition of the land. *See* 25 C.F.R. parts 151 (acquisitions) & 152 (disposal). Our focus in this case is the disposal of Indian land, specifically Smith's gift of a restricted interest in the Reserve to Miami Tribe. The BIA has promulgated regulations—applicable here, 25 C.F.R. §§ 152.23 and 152.25(d)—addressing the sale, exchange, and conveyance of Indian trust or restricted lands.

Before addressing the BIA's decision applying these regulations, we must consider whether the tribe has jurisdiction over the Reserve and the ILCA encourages approval of Smith's application.

1.  Miami Tribe's Jurisdiction Over the Reserve

The tribe's jurisdiction over the Reserve is a key threshold issue. The ILCA policy encouraging land consolidation between Indians and Indian tribes applies *only* to land the tribe has jurisdiction over. *See* 25 U.S.C. § 2216(a)(2) (encouraging consolidation of land ownership "between Indians and the tribal government *that exercises jurisdiction over the land*") (emphasis added). If the Miami Tribe exercises jurisdiction over the Reserve, the ILCA's policy would apply and substantially change the calculus of the BIA's decision.

The tribe argues it has jurisdiction over the Reserve and the congressional directive to facilitate consolidation applies to Smith's gift to the tribe. The BIA

-28-

did not apply this policy preference at first because it contends the tribe does not exercise jurisdiction over the Reserve. But, in the 2005 Order, the district court concluded the tribe had jurisdiction and therefore the policy preference in § 2216(a) served as the backdrop to the BIA's decision on remand.

In our review of the BIA's decision, we consider the tribe's jurisdiction over the Reserve, first, to determine whether the BIA should have started with this policy preference or simply a clean slate with nothing tilting the decision either way. After a careful review of the history, applicable law, and our previous cases reviewing the tribe's connection to the Reserve, we can safely conclude the tribe does not have jurisdiction over the Reserve and therefore does not exercise jurisdiction for the purposes of § 2216(a).

Congress passed the ILCA to address the problem of increasingly fractionated interests of Indian lands as well as to govern land conveyances between Indians and their tribes. In the ILCA, Congress stated

> It is the *policy of the United States to encourage and assist the consolidation of land ownership through transactions*–
>
> > (1) involving individual Indians;
> >
> > (2) between Indians and the tribal government that *exercises jurisdiction over the land*; or
> >
> > (3) between individuals who own an interest in trust and restricted land who wish to convey that interest to an Indian or the tribal government that exercises jurisdiction over the parcel of land involved . . . .

-29-

25 U.S.C. § 2216(a) (emphasis added). To remedy the fractionation problem, the federal government favors consolidation of lands between Indians and tribes, but only regarding land where a tribe exercises jurisdiction.

The ILCA does not define when a tribe "exercises jurisdiction over the land." The district court found the tribe exercised jurisdiction over the Reserve for the purposes of the ILCA and therefore the policy encouraging land consolidation applied to Smith's gift. But the BIA argues we previously resolved the issue in *Kansas v. United States*, 249 F.3d 1213 (10th Cir. 2001) (*Miami IV*), finding the tribe lacked jurisdiction over the Reserve.

In *Miami IV*, Kansas sought injunctive relief from a National Indian Gaming Commission (NIGC) determination that the Reserve's 35-acre parcel constituted "Indian lands" under the Indian Gaming Regulatory Act (IGRA). 249 F.3d 1213, 1220 (10th Cir. 2001); *see* 25 U.S.C. § 2703(4) (defining "Indian lands" as all lands within an Indian reservation or restricted fee land held by a tribe or Indian "over which an Indian tribe exercises governmental power"). The district court concluded the NIGC's decision ignored the threshold question of whether the tribe exercised jurisdiction over the Reserve and granted a preliminary injunction against all gaming related activities on the Reserve.

On appeal, we determined the NIGC "put the cart before the horse" when it decided Miami Tribe exercised "governmental power" over the Reserve without, first, determining whether the tribe had jurisdiction over the Reserve. *Miami IV*,

-30-

249 F.3d at 1229. We reasoned "before a sovereign may exercise governmental power over land, the sovereign, in its sovereign capacity, must have jurisdiction over that land." *Id.* Any analysis of "Indian lands" under the IGRA must begin with the "threshold question of the Tribe's jurisdiction, . . . [which] focuses principally on congressional intent and purpose, rather than recent unilateral actions of the Miami Tribe." *Id.* The tribe could not exercise governmental power over the Reserve without first having jurisdiction over the Reserve.

Considering the jurisdiction issue, we found the "most probative evidence of congressional intent and purpose . . . is the language of the legislation and treaties" regarding Miami Tribe and the Reserve. *Id.* The district court in *Miami IV* had already "thoroughly analyzed the question" of the tribe's jurisdiction over the Reserve and "concluded that no lawful basis existed to suggest the Tribe presently had jurisdiction over the tract." *Id.* at 1230 (citing *Miami Tribe of Okla. v. United States*, 927 F. Supp. 1419, 1424–27 (D. Kan. 1996) (*Miami I*)). We agreed, finding "Congress years ago '*unambiguously* intended to abrogate the Tribe's authority of its lands in Kansas and move the Tribe to new lands in Oklahoma.'" *Id.* (quoting *Miami I*, 927 F. Supp. at 1426). Among other events, in 1873, the tribe agreed to sell its land in Kansas and Congress expressly abrogated the tribe's jurisdiction over those Kansas lands.

The tribe did not appeal the district court's findings regarding jurisdiction over the Reserve, and in *Miami IV* we found those conclusions to be res judicata.

-31-

Rather than challenge the district court's conclusions, Miami Tribe also asserted its recent activities on the Reserve supported its claim for jurisdiction. We rejected this argument, finding that the tribe's recent connections to the Reserve (by adopting landowners as tribal members) did nothing to alter the fact that Congress had abrogated the tribe's jurisdiction over the Reserve long ago.

The same analysis is true here. Congress abrogated Miami Tribe's jurisdiction over the Reserve over a century ago. Nothing changes the fact that "in 1873, Congress expressly abrogated the Tribe's jurisdiction [over its former lands in Kansas], which was effective no later than 1924 when any members of the Tribe remaining in Kansas—and their heirs—became naturalized citizens." *Miami IV*, 249 F.3d at 1230 (quoting *Kansas ex rel. Graves v. United States*, 86 F. Supp. 2d 1094, 1096 (D. Kan. 2000) (*Miami III*)). In addition to this clear abrogation by Congress, the Reserve was originally allotted to Maria Christiana DeRome, who was not a member of the Western Miamis. In fact, Miami Tribe was reimbursed by the United States for the value of the Reserve precisely because the land was erroneously taken from the tribe and allotted to a non-member.

To be sure, the tribe is actively connected to the Reserve. For example, it has among other things (1) adopted the Reserve landowners as members of the tribe, (2) received consent from the Reserve landowners to assert tribal jurisdiction pursuant to a lease, and (3) developed the Reserve, including

regularly maintaining it and providing security. The tribe contends these actions demonstrate it exercises jurisdiction over the Reserve.

But these are the same activities we rejected as a basis for the tribe's claim of jurisdiction over the Reserve in *Miami IV*. *Compare Miami IV,* 249 F.3d at 1230–31 *with Miami I*, 374 F. Supp. 2d at 945. In *Miami IV*, we examined the tribe's recent activity within the Reserve, including the adoption of landowners as members, but stated

> None of these recent events, however, alters the conclusion that Congress abrogated the Tribe's jurisdiction over the tract long ago, and has done nothing since to change the status of the tract. An Indian tribe's jurisdiction derives from the will of Congress, not from the consent of fee owners pursuant to a lease under which the lessee acts.

*Miami IV*, 249 F.3d at 1230–31. Similarly, here, Miami Tribe cannot "exercise jurisdiction" under § 2216(a) without a Congressional grant of jurisdiction over the Reserve.[16]

In sum, the tribe lacks jurisdiction over the Reserve as required by the ILCA. Accordingly, the statutory policy in § 2216(a) encouraging consolidation does not apply to Smith's gift. Without that preference weighing in the tribe's

---

[16] Even if *Miami IV* were not on point, the case law does not support the proposition that adoption of a landowner by a tribe confers jurisdiction. *See United States v. Mazurie*, 419 U.S. 544 (1975). The tribe cannot create Indian reservation lands ex nihilo by adopting landowners into the tribe and claiming all of the new member's property.

favor, the decision to approve Smith's gift rests squarely within the BIA's discretion.[17]

## 2.   The BIA's Decision

Having settled the issue of the tribe's jurisdiction, we now consider the BIA's two reasons for deciding, in its discretion, to deny Smith's application:  (1) the gift was not in Smith's or other Reserve landowners' long-range best interests, and (2) the transfer would conflict with the federal government's fractionation policy.

*Long-Range Best Interests*

The BIA denied Smith's application, first, because it determined the gift was not in the long-range best interests of Smith or other Reserve landowners. When the BIA considers an application for a gift of restricted Indian land, the application "may be approved if, after careful examination of the circumstances in each case, the transaction appears to be *clearly justified in the light of the long-range best interest of the owner* or owners or as under conditions set out in § 152.25(d)."  25 C.F.R. § 152.23 (emphasis added).  Section 152.25(d) governs

---

[17]  Even if we found § 2216(a) applied, the BIA would still retain its discretion to deny the application.  In that situation, while a closer question, the BIA would properly be within its discretion if it denied Smith's application for any of the reasons articulated in its regulations.  The policy preference in § 2216(a) encourages the consolidation of land ownership but does not mandate it.

"Gifts and conveyances for no consideration or less than the appraised fair market value," and states

> *With the approval of the Secretary, Indian owners may convey trust or restricted land, for less than the appraised fair market value or for no consideration* when the prospective grantee is the owner's spouse, brother, sister, lineal ancestor of Indian blood or lineal descendant, or *when some other special relationship exists between the grantor and grantee* or special circumstances exist that in the opinion of the Secretary warrant the approval of the conveyance.

*Id.* § 152.25(d) (emphasis added). Distilling these regulations, an Indian may give an interest in restricted land if they have a special relationship with the grantee, and the BIA may approve such a gift if it concludes the gift is in the long-range best interests of the landowners.

In applying these regulations, the BIA has a duty to consider the donor's best interest

> In the case of a gift conveyance, it is BIA's duty to ensure that the prospective donor understands and intends the effect of his/her action. It is also BIA's duty to make a careful examination of the circumstances to determine whether the transaction is in the donor's best interest. BIA must refrain from approving a gift deed where there is any question as to the donor's intent or where the facts show the conveyance is not in the donor's best interest.

*Downs v. Acting Muskogee Area Dir.*, 29 IBIA 94, 97 (1996) (citation omitted). When deciding whether to approve a gift conveyance the "BIA owes a duty only to the landowner(s) . . . [which] includes discerning the grantor's intent and refraining from approving deeds where a question exists concerning that intent." *LeCompte v. Acting Great Plains Reg'l Dir.*, 45 IBIA 135, 143 (2007). The

-35-

actual determination of whether to approve a gift conveyance "is a matter within the discretion of BIA." *Id.* While perhaps these regulations reflect a paternalistic mindset, the simple fact is that applicable federal law vests substantial discretion with the BIA to approve or reject gift transfers by Indians.

Applying these regulations, the BIA acknowledged the special relationship between Smith and Miami Tribe—under § 152.25(d)—but found the partial transfer was still not in the long-range best interests of Smith or the other Reserve landowners—under § 152.23. In particular, the BIA found the transfer raised concerns regarding "tract management, competing interests between the tribe and the individual Indian landowners, and the potential for land use conflicts." *Id.* Also, the recent history and gaming-related aspects of the Reserve "continue[d] to cause [BIA] concern over the propriety of such a transaction."[18] *Id.* The BIA acknowledged Smith's desire to benefit the tribe, but stated "the existing business lease with the tribe will accomplish this" because the lease "gives the Tribe the necessary tool to undertake the development of a gaming facility and improve the potential for significant revenue for the Indian landowners." *Id.*

---

[18] The BIA received an opinion from a Realty Officer (RO) stating it could not recommend approval of Smith's gift conveyance because the transfer was not in Smith's or other individual landowners' long-range best interest or in compliance with the federal government's policy on fractionated interests. *See* Aplt. App. at 143–46. The RO provided detail regarding gaming activities and the Reserve. The RO was not convinced the transaction was one without the expectation of compensation due to the recent history and gaming implications of the Reserve.

The BIA also noted its position that Indian landowners should "receive at least fair market value when disposing of property" and that Indian tribes should pay fair market value for land purchases "unless special circumstances warrant otherwise." Aplt. App. at 133. While acknowledging the special relationship between Smith and the tribe, the BIA found there were no "special circumstances that would justify a gift of a portion of [Smith's] undivided interest to the Tribe" rather than a sale of the interest. *Id.*

In summary, the special relationship between Smith and the tribe did not overcome the BIA's finding that "the proposed gift conveyance [was] not in the long-range best interest of either [Smith] or the other Indian owners of the allotment." *Id.*

Our review under the APA's familiar arbitrary and capricious standard gives the BIA wide latitude to administer its duties under the regulatory scheme adopted by Congress. Our duty is "to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008) (quotation omitted). Therefore, "the ultimate standard of review is a narrow one [and we are] not empowered to substitute [our] judgment for that of the agency." *Utah Envtl. Congress v. Richmond*, 483 F.3d 1127, 1134 (10th Cir. 2007) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)) (alteration in original). We may not second-

guess the BIA so long as it acts within the boundaries set by Congress, and it has done so here.

Under these principles, the BIA properly interpreted and applied its own regulations, §§ 152.23 and 152.25(d), both of which afford discretion to approve a land transfer. The BIA recognized the special relationship between Smith and the tribe. But a special relationship permits a gift; it does not mandate it. *See* 25 C.F.R. § 152.25(d) ("Indian owners *may convey* . . . restricted land . . . when some other special relationship exists . . . .") (emphasis added). A gift conveyance also "may be approved" if after a "careful examination" of the circumstances the BIA determines the transfer is "clearly justified" as being in the long-range best interest of the landowners. *Id.* § 152.23. There are no explicit factors the BIA must consider when making its determination. Nevertheless, the BIA explained its rationale for denying Smith's application in some detail. Given those plausible grounds, we cannot substitute our judgment for the BIA's considered judgment.

The tribe claims the disjunctive "or" in § 152.23 requires the BIA to approve a gift when a special relationship exists under § 152.25(d) *without* performing a long-range best interests analysis. The government, in contrast, argues the BIA *must* review a gift for the long-range best interests, even when the gift falls within § 152.25(d). Section 152.25(d), itself, imposes no limits on the BIA's discretion to approve a gift. The BIA's discretion is limited only by the

-38-

general restriction that its decision not be arbitrary and capricious or contrary to law. Despite this, the BIA chooses to apply the long-range best interests analysis as a self-imposed limit to channel its discretion under § 152.25(d). That choice is neither plainly erroneous nor inconsistent with the regulation because it is a reasonable framework to guide the BIA's otherwise unfettered discretion. Therefore, we defer to the BIA's interpretation of its own regulation. *See Plateau Mining*, 519 F.3d at 1192.

The tribe also argues the consolidation policies set out in §§ 2216(a) and (b) of the ILCA reinforce the special relationship between Smith and the tribe is enough to compel approval of the transfer. But, as we discussed above, § 2216(a) does not apply because the tribe lacks jurisdiction over the Reserve. And § 2216(b) only provides that a gift "*may* be made" for less than fair market value if certain statutory conditions are met; not that it *must* occur. The decision is still within the discretion of the BIA and its consideration of the long-range best interests under § 152.23. If Congress intended to require the BIA to approve all transfers that qualified under §§ 2216(b) or 152.25(d) it certainly could have, but it did not.

In addition, the BIA's preference toward land transfers for fair market value does not run afoul of § 2216(b). Nothing in the statute abrogates the BIA's discretionary review of gift transfers or mandates their approval. If anything, the statute provides some protection to the agency by immunizing "approval of a

transaction" from allegations of "breach of trust by the Secretary."

§ 2216(b)(1)(A)(ii).

In short, the BIA's denial of Smith's application was a valid exercise of its administrative discretion. It was neither arbitrary nor capricious for the BIA to conclude the partial transfer of Smith's property interest to the tribe was not in his or other Reserve landowners' long-range best interests.

*Fractionation*

The BIA's second reason for denying the gift, dovetailing with its best interests conclusion, was that it conflicted with the federal government's policy opposing the creation of additional fractional interests in Indian lands.

Fractionation of Indian lands is an unintended consequence of the federal government's allotment policy, which allotted parcels of land to tribal members. As those members died, the land passed to their descendants and soon multiple owners took the place of the original allottee. *See Babbitt v. Youpee*, 519 U.S. 234, 237–39 (1997) (discussing the fractionation problem). Even though the allotment policy ended in 1934, the "consequences of that policy—fractional property interests—persists, and make a substantial amount of Indian land uneconomic." CONFERENCE OF WESTERN ATTORNEYS GENERAL, AMERICAN INDIAN LAW DESKBOOK 120 (4th ed. 2008); *see generally* Jessica A. Shoemaker, Comment, *Like Snow in the Spring Time: Allotment, Fractionation, and the*

*Indian Land Tenure Problem*, 2003 WIS. L. REV. 729 (2003); DAVID H. GETCHES,

ET. AL., FEDERAL INDIAN LAW 174–75 (5th ed. 2005).[19]

In 2000, Congress amended the ILCA "to slow future fractionation and to

consolidate existing fractional interests." CONFERENCE OF WESTERN ATTORNEYS

GENERAL, *supra*, at 123. The amendments reiterated its concerns regarding

fractionation and stated

> It is the *policy of the United States*–
>
>> (1) *to prevent the further fractionation* of trust allotments
>> made to Indians;
>>
>> (2) to consolidate fractional interests and ownership of those
>> interests into usable parcels;
>>
>> (3) to consolidate fractional interests in a manner that
>> enhances tribal sovereignty;

---

[19] *See* CONFERENCE OF WESTERN ATTORNEYS GENERAL, *supra*, at 120–21 (4th ed. 2008) (quotation omitted):

> A fractional property interest is a small, undivided interest in a tract of land held in common with a number of other small interests. When the original owners of allotments died, their heirs received joint undivided interests in the original allotment. Thus 40-, 80-, and 160-acre parcels became splintered into multiple undivided interests in land, with some parcels having hundreds, and many parcels having dozens, of owners. Because the land was held in trust and often could not be alienated or partitioned, the fractionation problem grew and grew over time. . . . Fractionated land interferes with comprehensive and constructive tribal land use plans. It presents financing barriers, and the costs of assembling sites or pooling rights for natural resource development and other projects may be unsurmountable. Consequently, the land is usually leased rather than improved and used by the owners. At times, it is impossible to secure agreement among all owners to lease and, as a result, valuable land is in a state of quasi-abandonment.

(4) to promote tribal self-sufficiency and self-determination; and

(5) to reverse the effects of the allotment policy on Indian tribes.

Indian Land Consolidation Act Amendments of 2000, Pub. L. No. 106-462, § 102, 114 Stat. 1991, 1992 (2000) (codified at 25 U.S.C. § 2201 note) (emphasis added).  One goal of the ILCA was "to promote consolidation of existing fractional interests, not to create new fractional interests for tribes to purchase." *Downs*, 29 IBIA at 98.  It is against this background that the BIA considered what effect Smith's gift would have on fractionation of the Reserve.

At the time of the BIA's decision, it was not seriously contestable that Smith's gift of only 1/3 of his interest would further contribute to the fractionation of the Reserve.[20]  If approved, the gift would have divided Smith's interest and made the tribe an additional landowner in the Reserve.[21]  The BIA recognized that, in its experience, "highly fractionated ownership interests greatly complicate the [BIA's] land management efforts and the successful discharge of the federal Government's trust responsibility."  Aplt. App. at 133.

[20]  As we have noted, in 2006 the tribe acquired a 3/19 remainder interest in the Reserve subject to Smith's life estate.  However, the tribe had not yet obtained this interest when the BIA considered, and denied, Smith's application in 2002.

[21]  The precise number of landowners is unclear.  The government states there are currently over 20 different Reserve landowners.  Aplt. Br. at 3.  However, as of June 2009, the BIA listed over 65 separate fee or trust interests held in the Reserve.  *See* Aplt. App. at 171–78.  Some interests were for as little as .03%.  *Id.* at 172.

When considering Smith's application, the BIA relied on its analysis in

*Downs v. Acting Muskogee Area Director*, 29 IBIA 94 (1996),[22] where the BIA

had previously denied a request to give an interest in the Reserve to Miami Tribe.

The BIA found Smith's gift presented the same issues as presented in *Downs*.[23]

In *Downs*, the BIA denied the gift transfer because there was no special

relationship—Downs was not a member of Miami Tribe—and, like here, the

conveyance was not in Downs's or the other landowners' best interests from a

"practical land management standpoint, nor as a sound estate planning strategy."

*Id.* at 96. The BIA determined the continued fractionation of the Reserve, and

injection of a tribal ownership interest, would "present very significant tract

management issues which would affect not only [Downs], but the other owners as

---

[22] Earline Smith Downs held a 16.4592% interest in the Reserve and sought to give 1% to the Miami Tribe and retain a 15.4592% interest.

[23] When the IBIA affirmed the BIA's decision, it noted Smith's request for a gift conveyance was similar to that made in *Downs*, with the one difference that Smith is a member of the tribe, and Downs was not. *Smith v. Acting E. Okla. Reg'l Dir.*, 38 IBIA 182 (2002).

Smith and Miami Tribe attempted to offer new evidence to the IBIA during their appeal that (1) a plan existed to consolidate the fractional interests of the heirs to the allotments, and (2) heirs representing 25% of the interests had agreed to transfer their interests to the tribe. The new evidence of a consolidation plan was offered to distinguish Smith's situation from *Downs* with respect to the ILCA fractionation considerations. The IBIA declined to consider this information because it was not presented to the BIA and concluded Smith and the tribe failed to distinguish their case from *Downs* with respect to fractionation.

well."[24]  *Id.*  Despite being framed as a gift, the BIA also found Downs's

proposed conveyance was "obviously not a conveyance without compensation,"

and expressed its "concern over the propriety of the proposed transaction."  *Id.*

As in *Downs*, here, the BIA found "[c]onveying only 1/3 of [Smith's]

undivided interest in the allotment would add to, rather than eliminate, the further

fractionation of individually-owned Indian lands."  Aplt. App. at 133–34.  The

transfer of only a portion of Smith's interest (1) "would not serve to consolidate

fractional interests and the ownership of those interest [*sic*] into usable parcels,"

(2) "would not enhance tribal sovereignty or promote tribal self-sufficiency and

self-determination over what can be accomplished through the lease," and (3)

"does not reverse the effects of the allotment policy on the Miami Tribe due to

the off-reservation, out-of-state location of the tract."  *Id.* at 133.  For these

reasons, the BIA concluded Smith's gift conveyance should be denied because it

would conflict with federal government policy on fractionation.

The district court concluded the BIA's decision was "based upon the

immediate, short-term effect of the proposed transfer" and failed to consider

Smith's proposed transfer "based upon the long-term impact on fractionation."

---

[24]  The BIA concluded managing the Reserve was difficult because of its
distance from BIA locations and other trust or restricted lands, and further
fractionation of ownership would only make the situation more difficult.  Also,
the BIA noted that, generally, tribes and individual owners often have competing
interests in the use of land when the tribes own only a small interest.  Miami
Tribe had plans to establish gaming on the reserve, but this plan was speculative
and BIA determined the best use of the land was agricultural.

*Miami Tribe of Okla.*, 374 F. Supp. 2d 934, 941–42 (D. Kan. 2005). The tribe had included the Reserve in its land consolidation plan approved by the BIA and was actively involved with the Reserve. The BIA's "exclusive focus on the short-term impact" of Smith's gift transfer on further fractionation of individually-owned Indian lands—in light of Miami Tribe's connections and ties with the Reserve—convinced the court that the BIA "failed to consider an important aspect of a factor upon which it relied in making its decision." *Id.* at 942.

We disagree. The BIA gave proper consideration to the potential for additional fractionation of the Reserve. Specifically, it was concerned about "highly fractionated ownership interest greatly complicat[ing] the Bureau's land management efforts . . . [and] tract management, competing interests between the Tribe and the individual Indian landowners, and the potential for land use conflicts." Aplt. App. at 133. And nothing suggests the BIA's focus was solely on any short-term effects. The agency could conclude Smith's gift did not further any of the goals listed in the United States' policy on fractionation—enhancing tribal sovereignty, or promoting tribal self-sufficiency and self-determination, *see* 25 U.S.C. § 2201 note—because the Reserve is outside of Miami Tribe's territory in Oklahoma and the tribe has no jurisdiction over the Reserve. The BIA properly determined Smith's gift would cause further fractionation of the Reserve by

splitting Smith's ownership interest and adding Miami Tribe as a partial landowner.[25]

In sum, the BIA's conclusion that Smith's transfer would increase fractionation of the Reserve was not arbitrary and capricious, or contrary to law.

### III. Conclusion

For the foregoing reasons, we VACATE the district court's final judgment and the 2005 Order reversing the BIA, and we REMAND for further consideration of Smith's application consistent with this opinion.

---

[25] Subsequent to the BIA's denial of Smith's application and the 2005 Order, Miami Tribe acquired a 3/19 remainder interest in the Reserve subject to Smith's beneficial life estate. Aplt. App. at 170; *see supra* n.6. While we express no opinion on the matter, the fact that the tribe now possesses an interest in the Reserve may affect the BIA's fractionation analysis on remand.